698 F.Supp. 348 (1988)
UNITED STATES of America, Plaintiff,
v.
WESTERN ELECTRIC COMPANY, INC., et al., Defendants.
Civ. A. No. 82-0192.
United States District Court, District of Columbia.
October 14, 1988.
*349 Charles F. Rule, Asst. Atty. Gen., Antitrust Div., Deborah A. Garza, Chief of Staff and Counselor to the Asst. Atty. Gen., Antitrust Div., Barry Grossman, Chief, Communications and Finance Section, Nancy C. Garrison, Asst. Chief, Communications and Finance Section, Luin P. Fitch, Ben Giliberti, Brent E. Marshall, Communications and Finance Section, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for U.S.
John D. Zeglis, Francine J. Berry, Mark C. Rosenblum, American Tel. and Tel. Co., Basking Ridge, N.J., Robert D. McLean, American Tel. and Tel. Co., Washington, D.C., Howard J. Trienens, David W. Carpenter, American Tel. and Tel. Co., Chicago, Ill., for American Tel. & Tel.
Thomas P. Hester, Alan N. Baker, Ameritech, Chicago, Ill., Alfred Winchell Whittaker, Kirkland & Ellis, Washington, D.C., for Ameritech.
James R. Young, John M. Goodman, Jane C. Luxton, Bell Atlantic, Washington, D.C. (Robert A. Levetown, Mark J. Mathis, of counsel), for Bell Atlantic.
Walter H. Alford, Executive Vice President and Gen. Counsel, Mark D. Hallenbeck, Gen. Atty., BellSouth Corp., Atlanta, Ga., W.M. Booker, Vice President and Gen. Counsel, South Cent. Bell Telephone, J. Robert Fitzgerald, Vice President and Gen. Counsel, Southern Bell Tel. and Tel., of counsel), for BellSouth Corp.
John R. Worthington, Sr. Vice President and Gen. Counsel, MCI Communications Corp., Washington, D.C., Chester T. Kamin, Michael H. Salsbury, Thomas S. Martin, Anthony C. Epstein, Glenn B. Manishin, Carl S. Nadler, John T. Nakahata, Jenner & Block, Washington, D.C., for MCI.
Saul Fisher, Mary McDermott, Richard A. Visconti, William J. Balcerski, NYNEX Corp., White Plains, N.Y., Martin J. Silverman, NYNEX Corp., Washington, D.C., for NYNEX Corp.
Richard W. Odgers, Randall E. Cape, Carol Elizabeth Frizzell, San Francisco, Cal., Stanley J. Moore, Washington, D.C., for Pacific Telesis.
*350 Liam S. Coonan, Southwestern Bell Telephone Co., Washington, D.C., William C. Sullivan, Linda S. Legg, Walter O. Theiss, Southwestern Bell Telephone Co., St. Louis, Mo., for Southwestern Bell.
Dana A. Rasmussen, Jeffrey S. Bork, U S West, Inc., David I. Shapiro, Richard C. Schramm, Geoffrey Bestor, Dickstein, Shapiro & Morin, Washington, D.C. (Laurence W. DeMuth, Jr., Stuart S. Gunckel, David S. Sather, of counsel), for US West, Inc.
Leon M. Kestenbaum, Michael B. Fingerhut, Washington, D.C., for U.S. Sprint Communications Co.

OPINION
HAROLD H. GREENE, District Judge.
The issues before the Court concern Regional Company practices with respect to so-called "calling cards," that is, telephone credit cards, and with respect to telephones owned by the Regional Companies that are located in public places (e.g., airports, service stations, street corners). Unlike many of the recent controversies in this case, the current issues do not involve the line of business restrictions on the Regional Companies; what is claimed here by the Department of Justice, with support from a number of the interexchange carriers, is that the Regional Companies have been favoring AT & T in violation of the nondiscrimination and equal access provisions of the decree.
The Department of Justice has filed a motion[1] pursuant to the decree,[2] seeking an order to enjoin (1) the continuing assignment to AT & T of all long distance calls[3] made on Regional Company credit cards; (2) preferential treatment accorded by these companies to AT & T's calling cards; and (3) the routing exclusively to AT & T of long distance calls from public telephones owned by the Regional Companies. The Court grants the motion in substantial part, but it denies some aspects of the requested relief.

I

Regional Company Calling Cards
This is the first time the Court has considered in detail telephone calling cards in light of the decree. Calling cards have assumed considerable importance in consumer telecommunications, as roughly fifty percent of operator-assisted[4] telephone traffic is now conducted by means of such cards. It is appropriate to outline briefly the evolution of the processing of these charge cards for making telephone calls.

A. Background

Prior to divestiture, the Bell Operating Companies performed billing functions for all Bell System calls. In order to permit customers to credit calls to their accounts when away from their home telephones, these companies issued so-called "calling cards" which enabled the holder to charge both local and long distance calls to the *351 account number appearing on the card. The customer could accomplish this task by punching the calling card number on a touchtone telephone, by reading the number to an operator, or by inserting the card into the telephone.
Although with the breakup of the Bell System, AT & T and the Regional Companies issued separate calling cards, they continued to share information concerning the identity of the customers who held cards and the validity of these cards. This sharing was specifically authorized by the Plan of Reorganization.[5] Under the Plan, the Regional Companies received the Data Base Administration Systems (hereinafter referred to as the DBA systems) which are used, inter alia, to assign and maintain calling card numbers, while the so-called Billing Validation Application database, necessary, inter alia, to validate calling cards,[6] was assigned to AT & T.[7] By virtue of the Plan, the Regional Companies are required to provide data base maintenance service under contract to AT & T.[8] The decree itself (in section I(A)(2)) gives the Regional Companies the right to continue to use AT & T's billing validation database for the limited purpose of validating local calling card calls.[9]
The existence and use of common databases not surprisingly led AT & T and the Regional Companies to adopt the same calling card number for any particular customer. Moreover, the contractual relations between the Regional Companies and AT & T resulted in the refusal of the former to share the information contained in these databases with any interexchange carriers other than AT & T; AT & T is therefore the only interexchange carrier to receive from the Regional Companies the information necessary to validate its calling cards.
The effect of these practices is that all long distance calls made with Regional Company calling cards are assigned to AT & T, and, as might be expected, the other interexchange carriers complain vociferously about this arrangement. After thorough examination, the Court has concluded, as did the Department of Justice, that these practices discriminate in favor of AT & T in violation of the decree.

B. The Decree Permits Regional Companies To Issue Calling Cards

MCI, US Sprint, and ALC Communication Corporation, all of them interexchange carriers, argue that the decree entirely forbids the Regional Companies to issue calling cards which may be used by the holder to charge long distance calls,[10] the argument being that the very issuance of such cards constitutes an interexchange telecommunications service prohibited to the Regional Companies by the decree.[11] *352 However, the Court concludes that the issuance by the Regional Companies of calling cards is not part of the interexchange business, and that the availability for use of Regional Company calling cards for long distance calling is not otherwise inconsistent with the decree.
The issuance of calling cards does not constitute an interexchange telecommunication service; rather, it is an "exchange access" service, a term which is defined in the decree as including the "provision of information necessary to bill customers."[12] This billing function permitted by the decree is not restricted to local calls; the Regional Companies are actually required by section II of the decree[13] to furnish exchange access services "for the interexchange services of any interexchange carrier."[14]
This understanding of the decree is further supported by the assignment of the DBA systems to the Regional Companies by the Plan of Reorganization. In fact, the Plan explicitly notes that these systems may be used to "update and maintain Calling Card and other billing information files...."[15] More, the DBA systems lawfully update and maintain calling card information for both local and long distance calls.[16] Since the DBA systems properly handle long distance calls under the authority of the Regional Companies, it is appropriate to conclude that these companies were intended to be able to bill long distance calls made from their calling cards.
The issuance by the Regional Companies of calling cards for long distance calls not only does not offend the terms of the decree; it is also consistent with its purposes. The purpose underlying the prohibition against the provision of interexchange services by the Regional Companies is the prevention of competition by these companies with the interexchange carriers for long distance business. United States v. Western Electric Co., 627 F.Supp. 1090, 1100 (D.D.C.1986). There is no threat of such competition in this instance.
Regional Company calling cards good for long distance calling create no incentives to favor their own long distance operations: the Regional Companies are prohibited from engaging in the long distance business. Moreover, the calling cards will not create incentives for the Regional Companies to favor one interexchange carrier over another; once the appropriate changes are made (see Part III, infra) the calling card holder (Part VII-A) or other third parties (Part VII-D)  not the Regional Company  will select the interexchange carrier as well as any additional interexchange services.[17] Indeed, Regional Company calling cards for long distance calls may be said actually to promote long distance competition, for they will permit a customer to select an up and coming interexchange carrier which is as yet unable to supply its customers with a calling card of *353 its own.[18]
It is also worthy of mention that calling cards are today a ubiquitous billing mechanism. They provide a convenient payment method for calls made away from the customer's usual telephone, an increasingly common occurrence. But they are a convenience to the customer only as long as they do not become too complicated for regular use. A prohibition on the use of the Regional Company calling cards for long distance calling would frustrate consumers who would be required to change cards every time they changed over from a local to a long distance call. In view of these customer complications, that kind of a prohibition is unwarranted in the absence of incentives for discrimination, and such incentives, as noted above, are absent.
Thus, on any basis  the language of the decree, its purposes, and the maintenance of an important aspect of universal service  the conclusion is inescapable that Regional Companies may issue calling cards usable not only for local but also for long distance calling  provided, of course, that they do not discriminate among the various interexchange carriers with respect to these cards. The Court now turns to that subject.

II.

Claimed Calling Card Decree Violations
Under the specific terms of the decree, the Regional Companies must offer exchange access as well as billing services on an equal and nondiscriminatory basis.[19] This mandate applies to the provision of billing services through Regional Company calling cards as to any other billing service.[20] For the reasons stated below, the Court concludes that the Regional Companies have used their calling cards in ways that treat interexchange carriers unequally and discriminate in favor of AT & T.
In its enforcement motion, the Department of Justice asserts that the Regional Companies' calling cards are used to AT & T's advantage in three ways. According to the motion (1) most, if not all, the Regional Companies provide to AT & T commercially important calling card validation data[21] that they do not make available to other interexchange carries; (2) some of these companies market or advertise their calling card in a manner that promotes AT & T's interexchange services over those of other interexchange carriers; and (3) several of the Regional Companies include an international number on their calling card that credits calls only to AT & T in circumstances where other interexchange carriers cannot obtain comparable international numbers. The Regional Companies have not, by and large, seriously contradicted this factual information. What remains to be decided is the consistency of these practices with the decree.

*354 III

Validation
With limited exceptions, the Regional Companies currently provide billing validation data[22] to AT & T, but not to other interexchange carriers.[23] At the time of divestiture, no other interexchange carrier offered operator services, and as a consequence only AT & T requested this validation information. That is no longer the case. US Sprint's predecessor GTE Sprint began to phase in operator services in early 1986,[24] and MCI expects to begin to do so shortly. Even some resellers and alternative service providers furnish the operator service necessary for the acceptance of calling card calls. None of these companies will or can[25] accept calls charged to Regional Company calling cards as long as the Regional Companies refuse to provide the information necessary to determine whether the caller is using a legitimate calling card.[26]
Obviously, AT & T derives a considerable competitive advantage from its sole access to the validation databases it shares with the Regional Companies. That advantage extends beyond the capture of direct calling card business. The inability of other interexchange carriers to accept calls made by way of Regional Company calling cards causes customer annoyance and discourages further attempts in other contexts to use any carrier other than AT & T. Beyond that, the lack of calling card validation capacity also hampers the attempts of competing interexchange carriers to persuade large businesses, hotels, and other major customers to presubscribe to their service.
All of the Regional Companies profess in their filings a willingness in theory to end their discriminatory validation practices,[27] but apparently only US West and Pacific Telesis have offered validation data or validation service to companies other than AT & T since the time the Department filed its motion.[28]
Not only is the failure to provide validation information to AT & T's competitors discriminatory; unlike some other services that are part of the calling card service (see infra), validation is not technically difficult.[29] In fact, no Regional Company contends that the provision of validation data to the interexchange carriers is not feasible, and none has contradicted the Department's assertion that no serious technical *355 difficulty exists. Nevertheless, it is apparent that the companies will not actually make the data available[30] unless there is a court order.[31]
Accordingly, the Court is ordering[32] the Regional Companies to cease discriminating in favor of AT & T in the provision of validation data on or before January 1, 1989.[33] Each Regional Company must certify to the Court on or before that date that it is currently making available and will continue to make available to all interexchange carriers requesting it the same validation data[34] for its calling cards that the company provides to AT & T, at the same prices, and on the same terms and conditions as are extended to AT & T.[35] Certification must include a description of the validation data, including updates that are available, and state the prices, terms, and conditions on which the Regional Companies validation data are available to AT & T and to the other interexchange carriers.[36]

*356 IV

Marketing and Advertising
Beginning in 1987 with the issuance of the Regional Companies' magnetic-encoded plastic calling cards, some of the Regional Companies began to advertise the cards for both long distance and local calls. For example, Bell Atlantic campaigned that its card "lets you charge local and long distance calls directly to your phone bill." These advertisements did not reveal that the Regional Companies automatically routed interexchange service to AT & T, nor did they inform the public, contrary to the implication in their announcements, that the Regional Companies themselves do not provide long distance service (which they are of course prohibited from doing).
On March 27, 1987 MCI requested a Department of Justice enforcement investigation which led to a June 5, 1987 letter from the Department to the Regional Companies advising them of the impropriety of such advertising.[37] The Department's advice was, of course, entirely correct. Any Regional Company advertising at this juncture will have the direct foreseeable effect of promoting AT & T services over those of the other interexchange carriers.[38] This violates the nondiscrimination provisions of the decree.
Shortly after they received the Department's letter, most Regional Companies ceased such advertising,[39] and all of them have now recognized that these advertisements promoting the use of their calling cards for long distance use are improper. However, what they contend is that, in view of the changed situation, a court order is unnecessary.[40] That is the principal question still before the Court on advertising at this time.
Although under the law injunctive orders will issue where the possibility remains that the prohibited conduct will recur,[41] the Court is reluctant to issue such orders here where that may be redundant or unnecessary. See also, note 38, supra. Accordingly, and since all the Regional Companies have discontinued their objectionable advertising, the Court will at this time refrain from dealing with the marketing and advertising subject by such an order. Of course if the Regional Companies, or any one of them, should in any way evade the prohibition on false[42] or misleading[43] advertising, prompt judicial action will follow.
Notwithstanding the Court's decision not to issue an order at this time on the general subject of advertising, it is necessary in view of past practices identifying the Regional Company calling cards with AT & T, *357 that misleading impressions be cleared up and that customers be informed that they have a free choice. In spite of the fact that Regional Company calling card instructions have specifically stated that long distance calls should be dialed on an 0+ basis, neither the cards nor the related information advised customers that when they dialed on such a basis, i.e., without an access code, their long distance calls were and still are carried by AT & T rather than by their own presubscribed interexchange carrier.[44] To remedy the effects of the prior discriminatory practices, the Regional Companies must, by January 1, 1989, notify their calling card customers that (1) any interexchange services charged to the card will be provided by an interexchange carrier, not by the Regional Company; (2) the interexchange carrier will not always be the carrier the customer selected in the presubscription process;[45] and (3) the customer should contact interexchange carriers for information about alternative methods of charging interexchange calls.

V

International Numbers
International numbers which appear on calling cards permit the holder to charge calls made from many foreign countries to the United States.[46] Five Regional Companies[47] use the same international calling numbers on their cards as AT & T uses on its cards.[48] Thus, all inbound international calls made using these Regional Company calling cards are automatically credited to AT & T. This practice, too, violates the decree's nondiscrimination provisions.
To make an inbound international call with one of these calling cards, the card holder provides to a foreign telephone agency, usually the governmental PTT (Post, Telephone, and Telegraph department), the account number appearing on the card. If the number fits the International Telegraph and Telephone Consultative Committee (CCITT) standard and the AT & T numbers,[49] the PTT allows the call to go through. Although Bellcore has assigned to interexchange carriers other than AT & T some blocks of numbers, foreign PTTs recognize only AT & T, and they automatically credit AT & T for all international calls made using a calling card that has an account number based on a home telephone number or a regional accounting office code  AT & T's calling card format. They do not permit any other carrier to transmit such a call. Thus, the user of a *358 Regional Company calling card with an international number has no choice as to which United States carrier transmits the call; it is always AT & T.
While the Regional Companies are not responsible for PTT policies which favor AT & T, they cannot, consistently with the decree, be allowed to perpetuate those policies as the use of what is in effect an AT & T international calling card number has some tendency to do.[50]
Nevertheless, for a variety of reasons, the Court does not consider it necessary, as several interexchange carriers as well as the Department of Justice suggest, to order the Regional Companies to cease the issuance of calling cards that bear an international number[51] and to withdraw or replace all such cards.
The international numbers on the calling cards provide an important benefit to American travellers: a simple and familiar way to pay for calls from abroad, particularly since the alternatives frequently involve a high hotel service charge, the necessity for paying for the call in foreign currency, or placing it at a foreign post office. Notwithstanding these considerations, the Court would order a halt to the current practice, without more, either (1) if the Regional Companies were responsible for the discrimination against the non-AT & T carriers, or (2) if such action by the Court would rectify the problem. Neither of these assumptions is correct, however.
If the foreign PTTs are unwilling to recognize any American interexchange carrier other than AT & T, that is of course deplorable from the point of view of American antitrust and pro-competition policies. However, it is not a matter that is within the power of the Regional Companies, or indeed of this Court, to change. What the Court could do, as indicated above, would be to stop all use by the Regional Companies of international numbers on their calling cards. That would not have the effect of altering foreign PTT policies; those foreign telecommunications agencies that recognize only AT & T could confidently be expected to continue to do so.
Indeed, such a court order would likely be counterproductive. To the extent that foreign telecommunications providers and their officials become more acquainted with interexchange carriers other than AT & T (see infra), they might become more sympathetic to the need to permit calls to be made through the medium of such carriers. Except for that possibility, the only real effect of such an order by the Court would be to make it more difficult for American travellers abroad to charge their calls.
Here, as in other matters, it is not necessary to cut off service completely or to do nothing. At least one Regional Company (BellSouth) has suggested that it is prepared to place on its cards the international number of any interexchange carrier to which the customer may have presubscribed. In the Court's view, such a solution, if required across the board, will adequately remedy the discrimination for which the Regional Companies are actually responsible.
Accordingly, the Court is ordering that the Regional Companies shall by January 1, 1989,[52] recall all their calling cards that carry the same international number as is used by AT & T. However, these companies may continue these cards in circulation, as limited to AT & T customers, if by *359 that same date they issue calling cards which list, instead of the number that identifies AT & T, the international number of any interexchange carrier other than AT & T to which the customer may have presubscribed.[53]

VI

Regional Companies' Acceptance Only of AT & T Calling Cards
The Regional Companies will currently accept AT & T calling cards for local calls; they will not do this, however, for any other interexchange carrier. For example, a caller attempting to use a US Sprint FONCARD to charge a local call will receive a Regional Company operator response that the calling card is not valid. The effect of this practice is to permit AT & T, and only AT & T, to offer a universal calling card, that is, a card that may be used for both local and long distance calls  a significant competitive advantage.
The reason given by the Regional Companies for accepting AT & T's cards for local calls is that they are able to use the DBA systems to validate calls charged to AT & T, but that they lack the necessary information to validate the calling cards of other interexchange carriers. However, the Regional Companies have long known that they were required to file, and they presumably did file, written commitments that they would provide "equal access to the interexchange carriers with respect to all LATAs within [their] control, on a nondiscriminatory basis, for intra-LATA as well as for inter-LATA traffic."[54] Obviously, with respect to the use that may be made of interexchange carriers' calling cards, exchange access is not being provided on an non-discriminatory basis.
The current discrimination would be removed if the Regional Companies stopped validating AT & T's calling cards until they had the ability to validate the calling cards of all interexchange carriers who wanted their calling card to have access to the local market. This remedy, however, runs the risk that the Regional Companies will never achieve that ability having no incentive to do so, and that they will instead entrench their own cards as the only universal calling cards. The only productive remedy therefore is to achieve validation of the cards of all interexchange carriers, not merely AT & T's.
The Department of Justice states that, notwithstanding the current violation, it cannot ask the Court for remedial action because it does not know how, technologically, the Regional Companies can validate the calling cards of interexchange carriers other than AT & T.[55] Likewise, neither the Regional Companies nor the interexchange carriers have informed the Court how the existing technological problems may be solved.
It appears that the principal difficulty is the receipt by the Regional Companies of the necessary data from the interexchange carriers and the need to program Regional Company equipment to permit it to recognize the issuing carriers' cards for validation purposes. This clearly should not be an insuperable problem if the parties will work together toward that end.[56] The *360 several Regional Companies have suggested in various ways that within the next few months they will be able to submit to the Court their proposed remedies.[57]
On this basis, the Court is ordering the Regional Companies to submit to the Court by January 1, 1989 proposed remedies that would afford to the calling cards of the interexchange carriers the same acceptance as is now given to AT & T cards.[58]

VII

Regional Company-Owned Public Telephones
The Regional Companies own large numbers of public telephones that are located on premises owned or controlled by others, including pay telephones in such places accessible to the public as airports, hotel lobbies, service stations, and bars. These public telephones generate enormous revenue: there are said to be 1.7 million Regional Company public telephones, yielding $2.5 billion in annual revenue.[59]
With respect to the matter of payment for the calls, two types of long distance calls are made from such public telephones: (1) calls which are paid for by coins deposited in the telephone mechanism, also known as 1+ or coin sent-paid[60] calls, and (2) all other calls, also known as 0+ or operator-assisted[61] calls. It is appropriate to consider first the 0+ calls since they constitute by far the majority of the public telephone traffic.

A. Operator Calls

The Regional Companies route all 0+ calls[62] from their public telephones to AT & T, yielding that company over one billion dollars annually,[63] even though other interexchange carriers now have the operator systems capacity to handle these calls. There is no serious dispute that this practice is discriminatory and violative of sections II(A) and II(B) of the decree, and the Court so concludes. The question is what system is to take its place.[64]
*361 The Regional Companies, the Department of Justice, and others all agree that a system which permits the billed party to select the interexchange carrier of his choice simply by dialing 0+ most perfectly comports with the language and purposes of the decree.[65]
That is clearly correct. Section (A)(2)(ii) of Appendix B of the decree unambiguously requires the Regional Companies to
offer ... access that permits each subscriber automatically to route, without the use of access codes, all the subscriber's interexchange communications to the interexchange carrier of the customer's designation (emphasis added).
Under such a system, all interexchange carriers offering service from a given telephone could be reached by the carriers' customers by dialing 0+; none would require the dialing of an access code. Moreover, access to all interexchange carriers would be equal, and it would be in the form most convenient to all callers because (1) a caller would not have to remember a long, complex access code, and (2) he would be charged for his calls by the same company to which he had presubscribed at his home.
Moreover, the choice of an interexchange carrier would lie, and appropriately so, with the one who paid for the call. On a calling card call, the call would be transmitted by the carrier preferred by the end user to whom the card was issued; on a collect call, the subscriber of the called number would determine the preferred carrier; and on calls billed to a third number, the subscriber at that number would designate the preferred carrier. In short, the interexchange carrier for each call would be the preferred carrier of the billed party, providing only that it served the originating and terminating locations of the call. Such a system would eliminate any threat of discrimination by the Regional Companies.
That kind of a system does exist in concept. The Line Identification Data Base (LIDB), which the Regional Companies are in the process of developing, will permit the routing of 0+ calls to the interexchange carrier selected by the customer, and it will also permit the necessary validation for billing purposes. Each Regional Company's LIDB will contain all valid telephone numbers and calling card numbers in its region, and each number will be associated with the appropriate indicators relevant to billing validation. These indicators will include means for identifying those customers who have specified in advance that they will or will not accept third-party billing or collect calls and to identify public coin telephones. The LIDB will also indicate the preferred carrier of the party to be billed.
So far so good. There is, however, one problem: the LIDB system is not technically perfected at this time. Depending upon the source of the information, a functioning LIDB system would appear to be between two and three years away.[66]
Thus, the question is whether alternative means exist to provide equal access from public telephones between now and then, for the Court cannot and will not permit the Regional Companies to delay implementation of this important aspect of the decree *362 for several years more. Numerous options have been proposed in the responses to the Court's August 5, 1988 request for briefs. The principal proposals made in these briefs are as follows: (1) a requirement of the use of a five-digit access code to reach an interexchange carrier  the Court will refer to this method as blocking since long distance calls made by a customer who dialed only 0+ would be blocked; (2) allocation of dial 0+ long distance public telephone traffic among the various interexchange carriers; (3) replacement of most of the existing Regional Company public telephones with new instruments equipped with carrier selection buttons; and (4) presubscription by the owner of the premises on which the Regional Company telephones are located.

A. Blocking

MCI and ALC propose that equal access be provided by eliminating 0+ interexchange dialing from Regional Company-owned public telephones. All such calls would be blocked, and use of any Regional Company public telephone for a long distance call would require the caller to use a 10XXX0+ access code[67] to reach an interexchange carrier. This proposal does not comport with the language or the spirit of the decree.
Access to interexchange carriers would surely be equal under this plan since all long distance callers from Regional Company public telephones would be burdened with a complex access code. To put it another way, long distance dialing would be equally inconvenient for all. However, the decree requires not only equality. By its language, it requires that the Regional Companies offer access "that permits each subscriber automatically to route, without the use of access codes, all the subscriber's interexchange communications ... (emphasis added)."[68] Blocking therefore would be inconsistent with the very terms of the decree.
Beyond that, with blocking, all callers would be required to acquaint themselves with access codes in order to effect long distance calling from a Regional Company public telephone. Every single long distance collect call, third-party billed call, and calling card call would require additional dialing, be it five or more digits, instead of a single digit  0. This would be a gross inconvenience to the public; unending public confusion and dissatisfaction would be inevitable if the great bulk of the long distance calls from public telephones could not be completed because the caller could not remember his access code  as many could not. It is precisely because five-digit access codes are inconvenient and difficult to remember that the equal access provisions of the decree mandate the universal use of the single digit.
The confusion would be compounded by the fact that pay telephone companies other than the Regional Companies would be able to offer 0+ dialing. Consequently, a caller would first have to determine who owns the telephone before he could know whether 0+ dialing was possible. Similarly, local, or rather intra-LATA, 0+ calls, from Regional Company telephones would continue to be completed since they would be technically feasible and there could not be a prohibition on such use. Not even studious callers would be likely to have researched whether a particular call would have to cross LATA boundaries.
Customer inconvenience led the Court to reject the blocking of long distance calls from telephones where the customer had not presubscribed to an interexchange carrier for his own home or place of business. United States v. Western Electric Co., 578 F.Supp. 668, 673-75 (D.D.C.1983). As the Court then said, "if a choice must be made between accommodating the interests of the public and those of various competitors in the interexchange market, the interests of the public must take precedence." Id. at 674.
The public has long been accustomed to the advantages of 0+ dialing without the *363 use of access codes, and the decree expressly requires that this beneficial public convenience continue. Consequently, the Court will not require the Regional Companies to block the 0+ calls.

B. Allocation

Some of the parties have suggested that all Regional Company public telephone traffic be allocated among the interexchange carriers, providing each carrier with a share of Regional Company public telephone 0+ access. The plans vary as to how the allocation is to be determined, which poses the initial difficulty of determining what is a fair formula.[69] But allocation reduces to more fundamental problems.
As the Court said when allocation was proposed in the context of the routing of undesignated traffic from homes and business, enterprises, a court-imposed allocation scheme would be "as foreign to its Tunney Act responsibilities as it would be fraught with ... practical obstacles." United States v. Western Electric Co., supra, 578 F.Supp. at 673. Moreover, allocation would not promote competition; rather, it would protect current competitors. Almost by definition, allocation would require that presubscription be shared by the existing interexchange carriers, to the exclusion of new ones, in contravention of the purposes of the antitrust laws.
As the Court has also previously noted, citing such decisions as Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the "antitrust ... laws are intended to protect the competitive process, not to assure positive results for competitors." United States v. Western Electric Co., supra, 578 F.Supp. at 672. And, of course, there is no reason to believe that the interexchange carrier to which a particular customer was assigned was one with which he wanted any relationship, except by relatively remote coincidence.[70]
For these reasons, the Court also rejects the imposition of allocation.

C. Telephones With Carrier Selection Buttons

ALC proposes that equal access can be met by Regional Company replacement of their current public telephone stock with new public telephones equipped with carrier selection buttons.[71] These new telephones would permit the caller to reach his preferred interexchange carrier by pushing a single button on the telephone instrument reserved for that carrier.
Obviously, as long as the telephones provided as many interexchange carrier buttons as there were interexchange carriers desiring to service that telephone, access would be equal. But if enough buttons (or room for enough buttons) were not available, serious problems would exist. For example, a telephone with twelve interexchange carrier buttons would not provide equal access in the Colorado market which is apparently serviced by over seventy interexchange carriers.[72] Moreover, in that market, even if each of the seventy carriers could be given a button of its own, the public would be stymied by the array of buttons. Thus, public inconvenience might suggest that equal access be provided another way.
More fundamentally, however, the instruments with buttons currently exist in *364 only a few locations.[73] Not only would mass replacement of virtually all Regional Company telephones be costly, ALC itself concedes that the process might take as long as five years.[74] This is a far longer period than has been estimated for the institution of the far better billed party preference plan discussed in Part VII-A, supra.
In sum, while a carrier-select telephone plan may work on an ad hoc basis, it does not appear to be a solution which can readily be applied throughout any Regional Company's territory, let alone on a nationwide basis.

D. Premises-Owner Presubscription

US West, NYNEX, Bell Atlantic, and Ameritech have proposed plans which would permit the owners of the premises on which the public telephones are located to choose which Regional Company to presubscribe with respect to these telephones.[75] While these plans differ in important respects, their common feature is to permit any premises owner to preselect the interexchange carrier which could be reached from the public telephones on his property without the use of an access code. If the caller dialed 0+, he would be connected with the interexchange carrier that was so presubscribed, and he could be billed either through the interexchange carrier's calling card (if he had one), or, once validation had become effective (see Part III, supra), through the Regional Company's calling card. Any other interexchange carrier could be reached through the use of an access code.
MCI and several others challenge this system even on an interim basis, raising a number of objections, which the Court has carefully considered, as follows.
First, MCI protests that under this proposal the choice of carrier would not be made by the "subscriber" or the "customer" placing the call, as required by section (A)(2)(ii) of Appendix B of the decree. The Court rejects that interpretation of the decree. To the extent that anyone can be said to be a "subscriber" in the public telephone context, it is the owner of the premises.
This is clearly so with respect to telephones in semi-public services (e.g., in bars, service stations). To be sure, one could conceivably conclude that it is the individual making the call, rather than the premises owner, who is the "customer," if not the "subscriber" in the context of truly public telephones (e.g., in airports, at street corners) although that is by no means certain even as a purely technical matter. However, since it is not technologically feasible at this time to provide the caller with the opportunity to exercise a choice of interexchange carriers by dialing 0+, it makes sense during the interim period to consider the premises owner as that individual's surrogate.[76]
Second, MCI makes the closely related contention that the premises owner is a "wholly illogical actor" with no relationship to the public telephone.[77] While it is true that the premises owner is virtually never the one who places or pays for calls from a public telephone on his property, he, more than anyone else, has an ongoing relationship with that instrument. Akin to the *365 subscriber of a residential or business telephone, the premises owner decides whether to have public telephones at all (and how many), what type the telephones should be,[78] what kinds of services they should offer, where they should be installed, and in some instances when they may be used, and when they should be removed. In short, the owner has ultimate control over the public telephones on his premises and a closer relationship with these telephones than anyone else.
Third, American Public Communications Counsel (APCC) contends that the premises owner would in reality be an "agent" or a person in active concert or participation with the Regional Companies.[79] But the Regional Companies would have no control over the selection of an interexchange carrier by the premises owner, and the premises owner would in fact be free to offer pay telephones which were not owned by a Regional Company.
Fourth, MCI claims that AT & T will continue to have an advantage with respect to public telephones because it uses the same telephone number as the Regional Companies and only its calls and callers are verified by these companies. That objection is well taken at this time. However, as explained in Part III, supra, exclusive validation of AT & T calling cards will cease within about two months, and the objection will then be mooted.
Finally, MCI contends that AT & T will continue to have an advantage over its competitors in that, with its traffic base from which to derive revenue for commissions and its greater knowledge of traffic patterns, it will most likely outbid the other interexchange carriers for presubscription to public telephones.[80] That, however, is not an objection that has validity under the terms and purposes of the decree. The decree is designed to remove artifical obstacles to fair competition; neither it nor the antitrust laws on which it rests can or were meant to erase all inequalities among the various carriers. Each carrier is of course free to spend its revenues as it sees fit, including for franchises on public telephones.
In short, the objections of the opponents are not sufficiently weighty to support a rejection by the Court of the option of selection of a presubscribed interexchange carrier by the owner of the premises, particularly when that option is considered in relation to the only other currently existing alternative  the blocking of all 0+ calls made from Regional Company-owned public telephones. At a minimum, it is clear that premises owner presubscription would be a significant advance over the present system.
Accordingly, the Court will approve on an interim basis (see infra) presubscription by the owner of the premises on which particular public telephones are located; it will be up to that owner to decide on the interexchange carrier that will be reached when 0+ is dialed on his telephone.[81] This solution also has the virtue, inter alia of being consistent with a 1985 Federal Communications Commission ruling on this subject.[82]See Allocation Order, 101 F.C.C.2d 911, 921 n. 37, 932 (1985) (petition for reconsideration pending).[83]
*366 To make presubscription by the premises owner meet the purposes of the decree, it will be incumbent upon the Regional Companies to inform these owners not later than January 1, 1989, that they may presubscribe to an interexchange carrier of their choice for their public telephones, and to institute by that date a system of balloting and allocation similar to that instituted by the Federal Communications Commission for presubscription in homes and business offices. See Allocation Order, supra, Appendix B at 927 (1985).
Thus, the Regional Companies will have to mail ballots for the selection of interexchange carriers to the premises owners by January 1, 1989 in the same manner as they provide ballots for presubscription of residence and business telephones. If a premises owner fails to return his ballot, the 0+ long distance traffic from the public telephones on his premises will be allocated by the several Regional Companies among the interexchange carriers proportionately to the carriers' selection rate from the ballot process.[84] The Regional Companies will also have to affix on the face of each of their public telephones the name of the interexchange carrier that will transmit 0+ calls from that instrument.[85]

E. Arrangement for the Future

It must be recognized that presubscription by the owner of the premises is not entirely satisfactory on several levels.
First, except coincidentally, the interexchange carrier selected by the premises owner is not likely to be the same carrier as the one the caller selected for his home or business telephone. When that occurs  as it probably will in most instances except where AT & T is the carrier  the 0+ option will not be available.[86] On this basis, while premises owner presubscription will be an advance over the present system where all public telephone long distance traffic is transmitted by way of AT & T, it will not achieve equal access on the basis of 0+ calling to the extent that the decree contemplates or to the extent that would be achieved by a system which would permit the billed party to make the interexchange carrier selection.
Second, customer confusion will exist to a significantly greater degree under the premises-owner option than under a system which permits the individual callers themselves to select the interexchange carrier of their choice simply by dialing 0+. For example, under the premises-owner option the customer of a particular interexchange carrier could make a long distance call from one public telephone simply by dialing 0+ while from another public telephone, even in the same region or town, he might have to dial a five-number access code. This is obviously undesirable.
Third, some customers not only will not know how to reach a particular carrier *367 because of these problems, but many of them will use whatever carrier to which a given public telephone was presubscribed, and this carrier in most cases is likely to be AT & T  once again perpetuating that company's existing advantage and thus frustrating true equal access.
Fourth, in their choice of an interexchange carrier, many premises owners are likely to subordinate quality of service and price  that are of paramount importance to the end users as well as to the purposes of the decree  to the amount of commission they may receive from particular interexchange carriers. This, too, would be inconsistent with the fundamental purposes of the decree.[87]
For these reasons, while the Court approves the premises owner option at this time and orders its implementation, that is with the reservation that this option does not fully meet the requirements of section (A)(2)(ii) of Appendix B of the decree. The Court expects that the Regional Companies will continue expeditiously to perfect the LIDB system[88] which, when placed into service, will permit full compliance with the decree. The Court will revisit this issue at a future date to determine what further arrangements and orders, if any,[89] are necessary.

VIII

Coin Sent-Paid Calls
In 1984, the Court granted a waiver to permit 1+ traffic, or coin sent-paid calls, from these telephones to be defaulted to AT & T, but the waiver was to be effective only "until such time as the Operating Companies are able to overcome the technological limitations which presently prevent them from handling inter-LATA sent-paid coin calling from multiple carriers."[90] Over four years have passed since that waiver was granted  a waiver which carried with it the expectation that the Regional Companies "will work with the carriers to develop the necessary technology to overcome the obstacles on an expeditious basis."[91] The responses to the Department's motion on calling cards and equal access to 0+ calls from Regional Company public telephones indicate that it is time for the Court to revisit the grant of February 6, 1984 waiver permitting the automatic routing of all sent-paid traffic to AT & T.[92]
Some Regional Companies assert that the software is not yet available to enable interexchange competition for calls made by depositing coins directly into the telephone apparatus, while others have proposed plans for providing equal access for coin sent-paid calls.[93] Those claiming inability to provide this equal access point to AT & T, a major vendor of switches, for the development of technology that, it is claimed, would provide equal access by way of access tandem switches over the same common trunk used with all other traffic.[94] U S West, on the other hand, represents that Northern Telecom has developed an equal access software capability for its switches.[95]
*368 It is not clear from the papers filed with the Court why AT & T has not developed such software or technology, or why the Northern Telecom method cannot be used here. Consequently, the Court is ordering the Regional Companies, and any other interested parties, to submit by January 1, 1989 proposed remedies on whether and on what basis the Court should remove its waiver of the decree obligation to provide equal access to coin sent-paid public calling.

Conclusion
The requirement that equal access be provided to all interexchange carriers is one of the key components of the decree, ranking closely behind the divestiture itself and the line of business restrictions on the Regional Companies.[96] Equal access with respect to credit cards and public telephones has assumed particular importance as the public relies more and more heavily upon these features, and as a number of the smaller interexchange carriers have acquired the capability to compete in these areas.
As the discussion above indicates, most of the obstacles to the achievement of that access can be overcome in relatively short order and without undue technological or other complications. This is particularly true since the Regional Companies have been on notice for months and even years that they are required to act in the areas under consideration. There is a general consensus that any necessary additional work[97] can be completed in two to three months. The Court has accordingly set January 1, 1989 as the deadline for the completion of these tasks. It is indeed appropriate that the necessary equal access steps be taken by that date, the fifth anniversary of the AT & T divestiture. Five years is long enough for the attainment of the crucial objective as between AT & T and its long distance competitors in the credit card and public telephone sectors, and the Court expects the parties to meet its deadline.

ORDER
Upon consideration of the motion of the United States for an enforcement order relating to Regional Company Calling Card Practices, the briefs, reports, and memoranda filed, directly or indirectly, with respect to the issues discussed therein, and the entire record, and in accordance with the Opinion issued contemporaneously herewith, it is this 14th day of October, 1988
ORDERED that each Regional Company shall certify to the Court, on or before January 1, 1989, that it is currently making available and will continue to make available to all interexchange carriers requesting it the same validation data for its calling cards that the company provides to AT & T, on the same prices, terms, and conditions as are extended to AT & T; and it is further
ORDERED that each Regional Company shall, on or before January 1, 1989, notify its calling card customers that (1) any interexchange services charged to the card will be provided by an interexchange carrier, not the Regional Company; (2) the interexchange carrier will not always be the carrier the customer selected in the presubscription process; and (3) the customer should contact interexchange carriers for information about alternative methods of charging interexchange calls; and it is further
ORDERED that the Regional Companies shall on or before January 1, 1989, recall all their credit cards that carry the same international number as is used by AT & T, provided that, if as of that date they have issued calling cards which list the international number of any interexchange carrier other than AT & T to which the customer may have presubscribed, they may continue in circulation the cards issued to AT & T customers; and it is further
*369 ORDERED that the Regional Companies shall submit to the Court, on or before January 1, 1989, memoranda detailing proposed remedies that would afford to the calling cards of other interexchange carriers the same acceptance as is now given to AT & T cards for intra-LATA calls; oppositions or other responses thereto shall be filed not later than January 20, 1989; and any replies thereto shall be filed not later than February 9, 1989; and it is further
ORDERED that the Regional Companies shall provide for premises owner presubscription of public telephone in a manner conforming with that delineated in Appendix B to In the Matter of Investigation of Access and Divestiture Related Tariffs, 101 F.C.C.2d 911, 927-34, and that they shall mail interexchange carrier selection ballots to all public telephone premises owners in implementation of such presubscription on or before January 1, 1989; and it is further
ORDERED that the Regional Companies and any other interested parties shall, on or before January 1, 1989, submit to the Court memoranda detailing proposed remedies on whether and on what basis the Court should remove its waiver of the decree obligation to provide equal access to coin sent-paid public calling; oppositions or other responses thereto shall be filed not later than January 20, 1989; and any replies thereto shall be filed not later than February 9, 1989.
NOTES
[1] Motion of the United States for an Enforcement Order Relating to BOC Calling Card Practices accompanied by the Report to the Court and Memorandum in Support of the motion, filed January 29, 1988. This motion and report followed various motions by MCI, one of which sought the entry of an order directing the Department of Justice, inter alia, to take immediate enforcement action with regard to the Regional Company provision of interexchange calling card services.
[2] United States v. American Tel. and Tel. Co., 552 F.Supp. 131 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) (hereafter AT & T). Jurisdiction to enforce the decree is vested in the Court by sections VII and VIII(I) of the decree. Id. at 231-32.
[3] Although there is a significant substantive difference between "long distance" on the one hand, and "interexchange" and "inter-LATA" on the other, that difference is largely not material for purposes of the questions discussed in this Opinion. Accordingly, for the sake of better understanding by the reader, the Court will generally refer to all three concepts as long distance, and to "intra-LATA" or "exchange" calls or services as local calls or services.
[4] "0+" calls are operator-assisted calls made by dialing zero plus the desired telephone number. All calling card calls are made using this prefix. "0-" calls are operator-assisted calls for which the caller dials zero and waits for the operator to pick up the line and talk to the caller in order to complete the call.
[5] AT & T Plan of Reorganization at 33 (Dec. 16, 1982).
[6] There were valid reasons for these separate assignments. The multifunction DBA systems were assigned to the Regional Companies because these systems were used principally to support local, or intra-LATA operator services (in addition to the maintenance and updating of calling card numbers). Id. at 33. Conversely, the Plan of Reorganization assigned the billing validation database to AT & T because that database performed predominately long distance functions. Id. at 25-26.
[7] The plan for the division of assets was approved by this Court and ultimately affirmed by the Supreme Court. United States v. Western Electric Co., 569 F.Supp. 1057 (D.D.C.1983), aff'd sub nom. California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).
[8] AT & T Plan at 33. The update information thus supplied includes changes in existing numbers and new card numbers issued to new customers.

As dictated by the Plan, the terms for the sharing of these facilities were embodied in the Shared Network Facilities Agreements between AT & T and the Regional Companies which expire in 1991.
[9] AT & T, 552 F.Supp. at 227.
[10] See, e.g., MCI Response to the Department's Report at 6-10 (February 23, 1988). The companies do not dispute that the Regional Companies may issue calling cards for local telephone traffic.
[11] Section II(D)(1) states that "[a]fter completion of the reorganization ... no [Regional Company] shall ... provide interexchange telecommunications services...." AT & T, 552 F.Supp. at 227.
[12] Section IV(F) of the decree. AT & T, 552 F.Supp. at 228.
[13] Section II of the decree. AT & T, 552 F.Supp. at 227.
[14] Appendix B, paragraph (C)(2). AT & T, 552 F.Supp. at 234. ALC implicitly acknowledges that calling cards facilitate billing, contending that Regional Company "calling cards should not be permitted to be used for billing inter-LATA calls (emphasis added)." Comments of ALC Communications Corporation at 2; letter from Mitchell F. Brecher to Nancy C. Garrison (July 20, 1987).
[15] AT & T Plan at 33.
[16] Id. In this light, the Plan provides that the Regional Companies furnish database maintenance services to AT & T under contracts for the sharing of multifunction facilities; however, AT & T does not have access to Regional Company proprietary information on DBA systems.
[17] The issuance of calling cards is unlike Regional Company involvement with shared tenant services, which the Court concluded were "interexchange telecommunications services." United States v. Western Electric Co., supra, 627 F.Supp. at 1098-1104, rev'd in part on other grounds, 797 F.2d 1082 (D.C.Cir.1986). With shared tenant services, the Regional Companies would have both selected the interexchange carrier for their customers and procured additional interexchange services for them. In addition, the companies would have bought interexchange services, marketed, and resold them to their customers in direct competition with other resellers and with facilities-based interexchange carriers.
[18] See Operator Assistance Network Opposition to MCI's Motion for an Order Compelling Enforcement of the Judgment (January 6, 1988) at 3 n. 1 and 12.
[19] Section II(A) of the decree requires that, subject to Appendix B, each Regional Company

shall provide to all interexchange carriers and information service providers exchange, information access, and exchange services for such access on an unbundled, tariffed basis, that is equal in type, quality and price to that provided to AT & T and its affiliates.
Similarly, section II(B) of the decree states in part that:
No [Regional Company] shall discriminate between AT & T and its affiliates and their products and services and other persons and their products and services in the ... interconnection and use of the [Regional Company's] telecommunications service and facilities or in the charges for each element of service....
[20] This is recognized in the Regional Company compliance plans submitted in 1984. See, e.g., Letter from Kenneth E. Milard, Senior Vice President and General Counsel of Ameritech, to James P. Denvir at 6 (Dec. 23, 1983) ("Calling card services will be provided by the Ameritech operating companies on a nondiscriminatory basis"); see also BellSouth compliance report dated June 28, 1984, at 3. The Regional Companies do not contend otherwise now.
[21] Validation data includes personal identification numbers (PINs) which are used to validate calling cards. The data also includes, among other things, working billable lines, and Toll Billing Exceptions (i.e., line numbers which cannot accept collect or third party calls).
[22] Interexchange carriers need validation data from the Regional Companies to permit them to confirm that the calling card offered for a given call is legitimate as having actually been issued by a Regional Company.
[23] As used in this Opinion, the term "interexchange carriers" also includes alternative service providers.
[24] Reply Comments of US Sprint at 5 (March 7, 1988).
[25] If a Regional Company calling card is used fraudulently to make a long distance call, it is the interexchange carrier who will not receive payment for the call.
[26] BellSouth goes so far as to refuse to authorize interexchange carriers other than AT & T to accept its calling cards because of the risk of fraud. However, the company is unwilling to furnish to those same carriers the information necessary to protect against fraud. BellSouth Response at 6 (February 23, 1988).
[27] See Ameritech Response at 21; Bell Atlantic Response at 3-4; BellSouth Response at 4-5; NYNEX Response at 2-3; PacTel Response at 2-4; Southwestern Bell Response at 2-3; and Comments of U S West, Inc., regarding the United States' January 29, 1988 Motion for an Enforcement Order Relating to BOC Calling Card Practices at 5-6 (responses and comments filed February 23, 1988).
[28] Service Link, a subsidiary of U S West, provides validation services to US Sprint. This arrangement is permitted by the decree. Since validation is an integral part of the billing process authorized by Appendix B, paragraph C(2), it is "information necessary to bill customers," which the Regional Companies may provide as part of exchange access "in connection with the origination or termination of interexchange telecommunications." Section IV(F), AT & T, 552 F.Supp. at 228.
[29] The Department of Justice observes that many of the issues require an understanding of technological and logistical issues, and the Department commendably secured from the Regional Companies technical and other information pursuant to section VI of the decree. Department of Justice Report at 6-7 and note 6.
[30] The Department characterizes the negotiations with the Regional Companies as making only "slow progress." Department of Justice Report at 20-21.
[31] Several of the Regional Companies claim to be "exploring" various alternatives (letter from BellSouth to the Department, dated November 10, 1987); or to be "plan[ning] to develop" a validation service (letter from Pacific Telesis to the Department, dated December 28, 1987); or that they are "willing to negotiate" (letter from Southwestern Bell to the Department, dated January 14, 1988).
[32] Southwestern Bell contends that no order is necessary because it is "acting or will act in all relevant areas." Response at 1-2. Other Regional Companies have filed similar comments. See, e.g., Ameritech Response at 20-21. But the companies' actual commitments are far less certain than these comments indicate. Southwestern Bell itself, for example, refers to the need to coordinate "complex tasks," an undertaking that "will be dependent not only on SWBT's efforts, but those of a third party." Response at 3.
[33] The 75-day lag time should be sufficient to permit the Regional Companies to assemble the data for dissemination and to reach the necessary agreements. It may be observed in this connection that the Regional Companies have been on notice of the need to correct discriminatory calling card arrangements since 1984, when MCI pointed to the unreasonableness of the companies' arrangements. MCI Comments on the BOC Compliance Plan at 35 (August 21, 1984). US Sprint directly requested validation information toward the end of 1986. Comments of US Sprint at 4-5 (February 23, 1988). US Sprint strongly intimates that some of the Regional Companies have been using technical and pricing issues to delay coming to agreements on validation. The Court does not expect to tolerate such tactics with respect to the deadline it is establishing here and in the accompanying order.
[34] There is considerable discussion in the papers as to whether the Regional Companies should provide validation data or validation services. Two Regional Companies  NYNEX and U S West  have agreed to provide the data; others have only promised services or suggested that they would provide data only through an independent third party. US Sprint objects to the provision of validation services on two grounds: (1) such a system would require the interexchange carrier first to screen each Regional Company card to determine the particular Regional Company to which the validation query should be sent  a complex and costly procedure, and (2) since validation services differ from the validation data that are provided to AT & T, it would be extremely difficult to ensure equality with AT & T on price, terms, and conditions. Reply Comments of US Sprint at 6-8 (March 7, 1988). The Court agrees with this assessment, and accordingly it requires the furnishing of the data themselves, and, since the data are provided to AT & T without a middleman, they must be provided to the other interexchange carriers on the same basis.
[35] Since the Regional Companies furnish to AT & T what are called "raw data," they must also provide such data to the other interexchange carriers. Some of the companies, i.e., NYNEX and U S West, have indicated their intention to do so; others, e.g. Southwestern Bell, have not. Equal treatment would not be provided unless the raw data are furnished.

However, the Court perceives no basis upon which it should require the Regional Companies to produce the shared Network Facilities Agreement and other documents governing their production of validation data to AT & T, as some interexchange carriers request. E.g., MCI's Reply at 10 (March 4, 1988). If there are questions about compliance with the Court's order herein, the Department can secure the necessary data pursuant to section VI of the decree.
[36] The Court rejects the US Sprint request that it provide "firm guidance" or "establish procedures" on the question of price. Reply Comments at 19, 23 (March 7, 1988). Obviously, however, the Regional Companies may not provide the data to AT & T at cost and make a profit on the same data as they are being furnished to the other interexchange carriers.
[37] Letter from Charles F. Rule to Laurence W. DeMuth, Jr., General Counsel to U S West (June 5, 1987). In that letter, the Department concluded that the current Regional Company calling card system "clearly" discriminated in favor of AT & T and that their advertising of their cards regarding long distance calling was misleading. The Department emphasized that "the [Regional Companies] were never authorized [by the Department or the Court] to promote the use of their cards for interexchange calling, particularly under circumstances where inter-LATA calls billed to those cards can be carried only by AT & T, or to suggest that the BOCs themselves are providing integrated inter-LATA service. Similarly, the Department never sanctioned such conduct."
[38] After January 1, 1989, once the required validation procedure and the presubscription plans for public telephones are in effect, this may no longer be true. However, such advertising may still mislead customers into believing that their long distance calls made with Regional Company calling cards will be carried by the Regional Companies themselves.
[39] Southwestern Bell initially refused to terminate its long distance calling card advertising. Letter from Linda S. Legg to Charles F. Rule (June 25, 1987) at 2.
[40] The Department of Justice, MCI, and others, affirmatively request a court order.
[41] See, e.g., United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).
[42] Any advertising or marketing portraying the Regional Companies as providers of interexchange services would be inconsistent with the express prohibitions of section II(D)(1).
[43] Ameritech has advised the Department of Justice that it is not engaged in advertising that is not "lawful and proper." Letter of General Counsel of Ameritech to Charles F. Rule (July 2, 1987). It is unclear what that phrase is designed to convey.
[44] Once this Court's order as to validation takes effect, and once public as well as private phones are serviced by interexchange carriers other than AT & T, long distance calls charged to Regional Company calling cards will not all be carried by AT & T. Nevertheless, such calls may still not be carried by the customer's presubscribed carrier, but by the carrier servicing the phone.
[45] In some cases, if the caller wanted to be certain that the carrier would be the one he had selected at home, he would have to dial an access code rather than 0+.
[46] A regular calling card number can be used to make a call from the United States to a foreign country.
[47] Ameritech, Bell Atlantic, BellSouth, Pacific Telesis and U S West. The other two Regional Companies do not offer international calling numbers on their cards.
[48] In contrast to domestic calling card numbers, international numbers are not used by the Regional Companies to charge for local telephone services. Furthermore, the international numbers do not appear to have a role in the Regional Companies' authorized billing functions. The companies apparently do not validate the international numbers, and the foreign telecommunications providers forward the billing data directly to AT & T.

It seems therefore that the international numbers are placed on Regional Company calling cards as a convenience to the customers, but they are also a promotional device to encourage the use of Regional Company calling cards.
[49] CCITT has established a standard format for international telephone numbers: 1 M XXX YYY YYYY Z. The "1" is the regional designation for North America; "M" indicates the validity period of the card; and "XXX" is the international calling code (INC), which identifies the international carrier that will receive the revenue from the call.

AT & T's calling card numbers use either NPA (area code) NXX XXXX, i.e., the customer's home telephone number, or RAO (regional accounting office code) YYY YYYY, for calling cards that are not based on home phone telephone numbers, e.g., some business accounts.
[50] Regional Company use of an international number which has the effect of crediting calls only to AT & T tends to promote the use of AT & T international carriage and service; to reduce PTT incentives to alter their policies so as to permit international service competition with AT & T; and to lead customers to believe that that number is the only way to make a call to the United States.
[51] The suggestion is that the use of such numbers should await the time when it will be possible for interexchange carriers other than AT & T to obtain international numbers that can be used in a manner comparable to AT & T's international number. No one can know how long that will be.
[52] Here again in the light of history, a 75-day deadline is plainly not unreasonable. NYNEX recognized the impropriety of including the AT & T number on its cards as early as 1984, Response at 26 n. 40, and all the Regional Companies were on notice of the unlawful nature of the practice since the Department of Justice's letter of June 5, 1987, sixteen months ago.
[53] MCI and others (but not US Sprint) contend that the Court should impose sanctions for the failure of the Regional Companies to cease distributing cards with international numbers after the Department of Justice, on June 5, 1987, advised them to do so. The Department itself urges the Court not to impose sanctions, on the theory that its own decree interpretations were tentative. In fact, the Regional Companies' view of the decree on this issue were hardly so deliberately violative of the Court's authority as to warrant criminal contempt or other sanctions. Accordingly, the Court will not initiate sanction proceedings with regard to this subject.
[54] United States v. Western Electric Co., 569 F.Supp. 990, 1006 (D.D.C.1983). Accordingly, the claim made by some that the equal access provisions of the decree do not apply to local calling, Bell Atlantic Response at 16 n. 41, is not only erroneous but inconsistent with and violative of the companies' prior undertaking.
[55] Report to the Court at 32-33 (January 29, 1988).
[56] The Department of Justice suggests that the difficulty may be that interexchange carriers might be reluctant to provide that customer information to the Regional Companies. Report at 32. If that be so, it would constitute a valid reason for Regional Company failure to proceed with the required remedy.
[57] Ameritech Response at 27-28; Bell Atlantic Response at 16; BellSouth Response at 14-15; NYNEX Response at 7; Southwestern Bell Response at 15; U S West Response at 8-9.
[58] Others may file comments suggesting remedies of their own, and they may of course also respond to the submissions of the Regional Companies.
[59] Reply Comments of US Sprint at 51 (March 7, 1988).
[60] On these calls, the caller dials a number direct, 1+, and pays for it in advance by depositing coins in the public telephones. Such calls account for less than ten percent of long distance calls originating from public stations. The remaining ninety percent are 0+ calls.
[61] These calls are collect, third-number billed calls, and calls made by the use of calling cards. The term "operator-assisted" calls is no longer entirely accurate because so-called "smart" calling cards can now often be used to complete calls without the intervention of an operator.
[62] Outbound international calls made from public telephones, also known as 01+ calls, are likewise routed exclusively to AT & T. The considerations discussed below that are relevant to the 0+ traffic also apply to these international calls.
[63] Forty-six percent of the calls made from Regional Company public telephones are 0+ long distance calls, yielding $1.1 billion in revenues, almost all of it to AT & T. Reply Comments of US Sprint at 51 (March 7, 1988).
[64] After the Department filed its motion and report on calling cards in the equal access context of the decree, U S West took steps to implement its own plans for the treatment of calls made from public telephones. MCI filed a motion to preserve the status quo which the Court granted, as it would have been entirely inappropriate to permit U S West by its unilateral action to implement its own plans on a subject which was then pending before the Court. Indeed, that Regional Company was not ignorant of the fact that the matter was sub judice, having filed pleadings with the Court on the matter of the Department's motion. Comments of U S West (February 23, 1988). The Court has decided that, on this occasion, it will not go proceed against U S West beyond issuance of the injunction previously handed down.

However, the Court observes that it will not tolerate a repetition of the types of maneuvers AT & T at times engaged in during the days of its monopoly, when, as between the FCC and the local regulators, it not infrequently claimed that the other had jurisdiction. So here, U S West's reliance on the FCC in implementing its plan was misplaced, not only because equal access is a specific subject of the decree, but also because the FCC had not issued a final order and had been relatively inactive on the issue in question during the last three years. See note 83, infra.
[65] For example, BellSouth believes this approach "best performs the function of providing equal access from public telephones." BellSouth Comments at 4 (August 26, 1988). Even those who advocate other plans as consistent with the decree prefer the customer choice approach. Ameritech says it "provides the most efficient, sensible and convenient handling" of dial 0 calls. Ameritech Memorandum at 12 (August 26, 1988). NYNEX likewise supports the use of a system to route all 0+ calls to the interexchange carrier selected by the party paying for the call. NYNEX Comments at 5 (August 26, 1988). Southwestern Bell refers to it as "the ultimate solution." Southwestern Bell Memorandum at 4 (August 26, 1988). US Sprint contends that the Regional Companies should be required to provide billed party preference on a national basis.
[66] Ameritech states that an automated system which would permit the customer to choose the interexchange carrier would take about eighteen to twenty-four months to implement. Ameritech Comments at 11 (August 26, 1988). Southwestern Bell states that once all regulatory requirements are met, deployment will probably take at least a year. Southwestern Bell Memorandum at 4 (August 26, 1988). BellSouth, the most pessimistic company, states that this solution to the equal access problem for 0+ calls could be employed by the mid-1990s. BellSouth Response at 6 and 8 (August 26, 1988).
[67] Each interexchange carrier has his own code.
[68] Section (A)(2)(ii) of Appendix B, AT & T, 552 F.Supp. at 233.
[69] Would all interexchange carriers receive the same share? Would the share be adjusted in accordance with the size of their existing clientele? Would the shares be allocated on a nationwide, a regional, or some other basis? These problems are reduced to manageable proportions in the context of limited allocation of defaulting subscribers following a balloting procedure. See Part VII-D, infra.
[70] In that respect, an allocation scheme would not be much of an improvement over the current system which assigns everyone to AT & T.
[71] ALC Memorandum at 6 (August 26, 1988).
[72] Memorandum of U S West at 14 n. 35 (September 9, 1988). Indeed, in airports, train stations, and the like, where travellers congregate from all over the United States, buttons might have to be installed for all American interexchange carriers.
[73] Several of the Regional Companies are installing this type of telephone in a few areas which have high long distance usage, such as airports and hotels. ALC Memorandum at 4 (August 26, 1988).
[74] ALC Memorandum at 6 (August 26, 1988).
[75] Southwestern Bell has also indicated that it intends to propose amendments to its equal access compliance plan to implement a premises owner presubscription plan. That company, as well as NYNEX, would default to AT & T all long distance calls from its unsubscribed public telephones.
[76] In significant ways, the choice exercised by the premises owner is like that of the owner of a hotel or of a public telephone not affiliated with a Regional Company. These owners exercise the choice of an interexchange carrier for those using their facilities.
[77] MCI's Motion to Preserve the Status Quo at 12-13 (July 29, 1988).
[78] The premises owner will of course be free to buy or use a pay telephone from a private pay telephone business instead of allowing a Regional Company to install one of its instruments on his property.
[79] APCC Comments at 13 (August 26, 1988).
[80] MCI Reply at 5-6.
[81] Of course, if the Regional Companies "rewarded" premises owners who selected AT & T or penalized those who did not, as MCI, among others, fears, MCI Reply at 19-20, they would be in violation of the decree and subject to sanctions.
[82] The Court has also striven in the past to avoid conflicts with FCC rulings in "overlap" areas where that has been possible. See, e.g., United States v. Western Electric Co., Inc., C.A. No. 82-0192, slip op. at 49-50 (D.D.C. March 7, 1988) [available on WESTLAW, 1988 WL 34937].
[83] However, the Commission's apparent view that the subject of equal access is best addressed on a local basis, Allocation Order, supra, 101 F.C.C.2d at 921 n. 37, may not be consistent with a decree which has nationwide application and requirements. The Court also rejects the position, espoused by U S West, Memorandum of August 10, 1988, at 4-5, that on this issue "the doctrine of primary jurisdiction would dictate that the Court defer to the FCC." See United States v. Western Electric Co., Inc., 846 F.2d 1422, 1433-34 (D.C.Cir.1988); United States v. AT & T, 461 F.Supp. 1314, 1320-30 (D.D.C.1978). The decision cited by U S West in support of its proposition, Far East Conference v. United States, 342 U.S. 570, 574-75, 72 S.Ct. 492, 494-95, 96 L.Ed. 576 (1952), has no relevance whatever to the issue for which it is cited, for it does not deal with the construction and enforcement by a court of its own judgment. Moreover, the FCC does not appear to have progressed beyond issuance of its 1985 preliminary order with respect to public telephones, "nor has the FCC conducted further proceedings to consider and adopt industry-wide guidelines for implementing public telephone equal access." AT & T Memorandum to the Court dated August 26, 1988, at 4-5.
[84] This system, proposed by U S West, was found satisfactory by the Department of Justice, Memorandum of the United States at 7-9 (September 9, 1988), and it is deemed satisfactory by the Court.
[85] All callers would, of course, maintain the ability to reach their own interexchange carrier by dialing its five-digit access code.
[86] With respect to all such traffic, the caller will need to use the more complex access code. If, as will be true in many instances, he does not know or remember the access code of his home interexchange carrier, he will have to make two calls: one to that carrier to obtain the code, the second to place the long distance call. MCI Motion to Preserve the Status Quo at 15 (July 29, 1988); U S West Motion to Vacate at 14-15 (August 8, 1988). This is of course no different from the current situation for customers now using an interexchange carrier other than AT & T.
[87] See BellSouth Comments at 11 (August 26, 1988); see also Department of Justice Competitive Impact Statement, 47 Fed.Reg. 7170, 7176 n. 21 (February 17, 1982).
[88] See Part VII-A, supra.
[89] It may be that in the meantime the FCC will proceed further with its 1985 proceeding, see supra, and, just as it did by the adoption of its balloting and allocation plan for residential and business customers, Allocation Plan, supra, render further action by the Court unnecessary.
[90] United States v. Western Electric Co., Civil Action No. 82-0192, slip op. at 10-11 (D.D.C. Feb. 6, 1984).
[91] Id. at 11 n. 17.
[92] These responses in essence suggest that nothing significant or concrete has been done.
[93] See, e.g., Letter from Jeffrey S. Bork, U S West, to Nancy C. Garrison at 2 (July 1, 1988); Comments of NYNEX Corporation at 9 (August 26, 1988).
[94] Ironically, AT & T claims that a default to it is unnecessary because the technology for equal access with respect to 1+ calling already exists. AT & T Memorandum at 6 n. * (August 26, 1988).
[95] Memorandum of U S West at 32 (August 10, 1988).
[96] Indeed, some would rank equal access higher than that.
[97] With respect to some subjects (e.g., validation of credit cards) the process can be completed in that period of time; with respect to others (e.g., coin sent-paid calling from public telephones) the technological and logistical issues can be laid before the Court during that interval.