**UNITED STATES of America, Plaintiff,**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., Defendants.**

**Civ. A. No. 82–0192 (HHG).**

United States District Court, District of Columbia.

May 8, 1990.

Constance K. Robinson, Director, AT&T
Enforcement Task Force, George S. Baran-
ko, Laury E. Bobbish, J. Philip Sauntry
and Kenneth W. Gaul, Antitrust Div., U.S.
Dept. of Justice, Washington, D.C., for
plaintiff.

Howard Adler, Jr., Davis, Graham & Stubbs, Washington, D.C., and Dan K. Webb, Winston & Strawn, Chicago, Ill., for US West, Inc.

## OPINION

HAROLD H. GREENE, District Judge.

A number of issues relating to the equal access obligations of the Regional Companies remain to be resolved although, as explained below, substantial progress toward equal access has been made, and the problems, when measured against the original requirements, are not of exceptional magnitude.

## I

### Introduction

Section II(A) of the decree requires each Regional Company to provide to all interexchange carriers and information service providers access to its local network, subject to Appendix B, which is "equal in type, quality, and price to that provided to AT & T and its affiliates." In implementation, Appendix B, in turn, requires the Regional Companies, inter alia, (1) to provide equal access through at least one-third of their access lines by September 1, 1985, and, (2) upon a bona fide request to provide such access with respect to every end office by September 1, 1986. However, even the September 1, 1986 deadline is waived for nonconforming offices [1] as to which a Regional Company shows that for particular categories of services "such access is not physically feasible except at costs that clearly outweigh potential benefits to users of telecommunications services." Appendix B(A)(3) of the decree.

The cost-benefit provisions of Section A(3) of Appendix B were incorporated into the decree in recognition of the difficulty and expense posed by conversion of some nonconforming end offices. Regional Companies are able to convert most conforming end offices to equal access merely by modifying the software that controls the switch and adding memory and processing capacity. However, conversion of nonconforming offices served by antiquated electromechanical switches often requires replacement of the existing switch with a new digital switch with equal access capability.[2] In any event, any denial of access must be for the minimum divergence in access necessary, and for the minimum time necessary to achieve such feasibility.

By the September 1, 1986 deadline, nearly all conforming offices had been converted to equal access. This was not true, however, with regard to many nonconforming offices, and some of these are still not converted [3]—at least not to the satisfaction of the interexchange carriers—and the Court here deals with the issues arising from these nonconversions. In addition, in October 1988, the Court ordered the Regional Companies to submit plans for the conversion of pay telephones to equal access. These plans were filed on December 30, 1988, comments and responses were received in January 1989, and reply comments were filed on March 13, 1989. These plans raised yet new equal access concerns, which are also considered below. Finally, the Court here considers a dispute between AT & T and the Regional Companies concerning the costs of equal access and network reconfiguration.

---

1. Conforming offices are those served by stored program control switches or switches that characteristically serve over 10,000 lines. Nonconforming offices a.e served by "switches technologically antecedent to electronic, stored program control switches or those offices served by switches that characteristically serve fewer than 10,000 lines." Appendix B(A)(3). The most common non-conforming offices are served by step-by-step (SxS) and No. 5 crossbar (5XB) electromechanical switches. There are also several electronic nonconforming offices (for example, 2ESS, 3ESS).

2. It is because of the added burdens associated with nonconforming offices that the decree allows the Regional Companies additional time for compliance with the equal access requirements, provided that they demonstrate to the Court that the costs would clearly outweigh the benefits.

3. As indicated below, while there are many nonconforming offices that were not converted as requested prior to the September 1, 1986 deadline, these offices actually serve comparatively few lines.

## II

### Equal Access to Local Offices

#### A. Background

In 1984, the Regional Companies submitted equal access plans to the Department of Justice pursuant to section II(C) of the decree. These plans listed the numerous end offices scheduled for conversion in compliance with the deadlines contained in the decree. As to all of these end offices, the Regional Companies completed conversion to equal access as scheduled.

In February 1986, MCI submitted a bona fide request, pursuant to Appendix B of the decree, for equal access with respect to some 1,400 end offices which had not been scheduled for conversion by September of that year.[4] As the deadline for conversion of offices subject to a bona fide requests approached, it became clear that the Regional Companies would not meet that deadline with respect to these offices.

■ After some prodding by the Department of Justice, and finally pursuant to an order of the Court, the companies filed their requests for waivers of the September 1, 1986 deadline pursuant to section (A)(3) of Appendix B of the decree on August 1, 1986. Among other things, these filings set forth the conversion schedules of the various Regional Companies with respect to those offices that would not be converted by September 1, 1986.[5] The De-

partment then filed a report to the Court concerning its view of the status and progress of equal access conversion.[6]

In its report, the Department of Justice noted that the conversion schedules of several of the Regional Companies were dependent upon the use of alternative technologies. Instead of providing equal access by the replacement of existing switches, these alternative technologies were to modify existing arrangements, and on this basis, conversion to equal access could be achieved more economically and more quickly. Several of the interexchange carriers supported the use of alternative technologies, but only if they provided acceptable service quality, and the Department of Justice moved the Court to defer ruling on the proposed conversion schedules to give the parties time to test the quality and reliability of the alternative technologies. That motion was granted.

Following completion of testing of the adjunct devices, the Regional Companies submitted a new round of filings in support of their conversion plans, and the Department of Justice submitted a new report in 1988. In response to that report, some of the interexchange carriers continued to object to the lengthy conversion schedules, as well as to the use of alternative technologies on the ground that they provided inferior service. After substantial briefing by

---

4. Prior to that time MCI had engaged in correspondence with the Regional Companies for a substantial period of time in an attempt to achieve the equal access result without court action.

5. These filings also advanced various arguments as to why the waiver requirements were not applicable. These arguments are entirely without merit.

 Some Regional Companies argued that because their conversion schedules are consistent with their June 1984 Compliance Filing with the Department of Justice, and because they are accepting bona fide requests for conversion by the interexchange carriers, they have met the requirements of the decree, even though their proposed conversion schedule extends beyond the September 1, 1986 deadline provided in section A(1) of Appendix B. See, e.g., BellSouth's August 1, 1986 Comments Regarding Compliance, Appendix A at 9; August 1, 1986 Response of Southwestern Bell at 13–15. According to Pacific Bell, section (A)(3) of Appendix B does

not apply when it and MCI have agreed to a conversion schedule; when the conversion is impossible to achieve by September 1, 1986; or when the requested access will be provided within a "reasonable time." Motion of Pacific Bell and Nevada Bell for Instructions or, in the Alternative, a Waiver, June 27, 1986, at 3; July 23, 1986 Reply of Pacific Bell at 6–8.

 These interpretations are untenable, for they would read both the September 1, 1986 deadline in section A(1) of Appendix B and the requirements of section A(3) of that Appendix out of the decree altogether. In addition, such an interpretation would be tantamount to replacing the Court's evaluation of a Regional Company's equal access schedule with that of the company's. Nothing in the decree, in Appendix B or otherwise, indicates that these provisions are mooted by the filing of Compliance Plans, or by the asserted reasonableness of the proposed schedules.

6. Report of the United States to the Court Concerning the Status of Equal Access dated October 31, 1986.

all interested parties, it is now apparent that the disputes between the parties, as narrowed, involve essentially the questions of what constitutes a reasonable time for conversion of the nonconforming offices and whether the use of alternative technology is an acceptable means of providing equal access.

## III

### Reasonable Time for Conversion

■ MCI, the largest non-AT & T interexchange carrier, maintains that any delay beyond September 1, 1986, the date specified in the decree, is unacceptable, regardless of when the request for conversion was made. The Court rejects that contention. It so happens that MCI made its request in February 1986—seven months before the proposed deadline. However, under MCI's theory, had it made its request for the conversion of a particular end office on August 31, 1986 instead, the Regional Company involved would have had to convert the end office the very next day. This obviously would have made no sense, and on this basis alone the Court does not accept the MCI rationale. The extensive briefing on this issue has persuaded the Court that conversion of these offices within the few months remaining under the decree would have entailed costs far outweighing the benefits of such conversion.

■ The question remains, however, as to how much time in excess of the September 1, 1986 deadline is reasonable. Under the decree, each office delay must be considered and justified individually. However, because there are some 1,400 end offices and seven different Regional Companies subject to the MCI request, consideration of each office separately is impractical. Accordingly, the Court has fixed a period of conversion that is *prima facie* reasonable, and it will consider conversion delays in the context of that standard time period.

Appendix B became effective, as did the remainder of the decree, in January 1984. As indicated, the Appendix gave the Regional Companies until September 1, 1986 to convert all end offices subject to a request for conversion to equal access. Thus, two and one-half years were provided, by the decree itself, for conversion of all of the end offices.

This relatively lengthy time period constitutes an implicit recognition of the difficulties inherent in accomplishing such a conversion. Thousands of requests and thousands of end offices were involved. The work for the conversion required thousands of man hours of labor, both to replace switches and to ensure that the conversion was accomplished without disruption of telephone service to consumers.[7]

According to the Regional Companies, the average time actually needed for the conversion of a non-conforming end office is eighteen to twenty-four months. Thus the time originally allotted in the decree is the maximum standard time. To complete all of the conversions requested by MCI in one-third of this time—a mere seven months—would have involved a huge and sudden expansion of the Regional Companies' workforce; tremendous, concentrated expenditures for the new switches; and potentially serious interference with customers' telephone service during the expedited conversion process. Balanced against these costs are, of course, the equal access benefits to the people serviced by these end offices. As indicated, the vast majority of these end offices, however, are very small, serving only relatively few lines. The Court concludes, as does the language of the decree itself, that the equal access benefits of conversion on a sharply accelerated schedule are outweighed by the costs of converting them quickly to equal access. Delay for the "minimum" amount of time following the receipt of a request is appropriate under Appendix B.

In recognition of these factors, the Department of Justice has recommended that

---

7. Specifically, each switch replacement involves (1) estimating the number of equipment frames required, (2) preparing a detailed switch design order, (3) manufacturing and shipping the switch from the date of the firm order, (4) installing and testing equipment by the installation crew, and (5) testing by the telephone company operations personnel. Affidavit of Joseph F. Luby attached to the July 31, 1986 Memorandum of Ameritech on Its Equal Access Performance; Exhibit 6 to Motion and Memorandum of the NYNEX Telephone Companies for Approval of their Equal Access Schedules (August 1, 1986).

the Court adopt twenty-four months as a prima facie reasonable period of time in which to satisfy requests for conversion to equal access. Upon review of this recommendation, and of the memoranda, affidavits, and declarations of the Regional Companies and other interested parties, the Court concludes that a standard conversion time of twenty-four months from the time of the request for all requests for conversion of nonconforming offices is prima facie reasonable. With respect to these requests, the Court is allowing the maximum standard time, because of the great number of conversions that had to be accomplished simultaneously.

In the event that additional requests for conversion are made hereafter, the reasonable time for satisfying those requests will be eighteen months, as such requests are likely to involve only a very few scattered offices and thus a much reduced burden.

## IV

### *Alternative Technologies and Conversion Schedules*

Bell Atlantic,[8] Ameritech,[9] and Bell-South[10] have provided equal access to all end offices requested by MCI within two years of MCI's request and without the use of alternative technologies. These companies are in full compliance with the equal access provisions of the decree, and nothing further needs to be done.

### A. *Use of Alternative Technologies*

The August 1, 1986 filings of the four remaining Regional Companies[11] proposed conversion schedules far longer than the twenty-four months considered above.[12] In order to reduce the costs involved and therefore the time required for conversion, all of these companies proposed the use of alternative technologies to provide what they refer to as equal access. With respect to these companies, a mere finding that they converted their end offices within twenty-four months of MCI's request is therefore not sufficient. Furthermore, although MCI and other interexchange carriers were initially receptive to the use of alternative technologies, they now contend that such technologies do not provide equal access. Thus, the Court must also determine whether use of the alternative technologies actually provides equal access.

■ While the interexchange carriers do not object in theory to the use of alternative technologies,[13] they maintain that the quality of the access provided by these technologies is inferior to that provided by the installation of new switches. According to these companies, the adjunct devices are unreliable.

The Court will not reject the alternative technologies on the basis of this assertion alone. While it does appear that several of the devices broke down shortly after they were installed, the Court has been given no evidence that these problems have continued, and it is unwilling to reject all the alternative technologies simply because there were difficulties in their early deployment.

■ Several of the interexchange carriers also complain about the post-dial delay caused by the use of these adjunct devices. However, the fact is that such delay affects AT & T and the other interexchange

8. Bell Atlantic was committed to completing all but one of the twenty-two end offices requested by MCI by the end of 1987. Bell Atlantic filing, August 1, 1986. As of January 29, 1988, all twenty-one conversions had been completed. Final Report of the United States at 12 (January 29, 1988). As to the last office, MCI does not object.

9. Ameritech letter to Department of Justice, February 2, 1987; Final Report of the United States at 12 (January 29, 1988).

10. BellSouth letter, January 28, 1987, Response to Information Request, page 3; Final Report of the United States at 13 (January 29, 1988).

11. Southwestern Bell, Pacific Telesis, U S West, and NYNEX.

12. For example, the conversion schedules of NYNEX and U S West stretch until 1992.

13. The Court notes that it was not a requirement of the decree that equal access be provided only by replacing switches or that such access be technologically identical. *See* 569 F.Supp. 1057, 1063–1066.

carriers equally. These carriers maintain, however, that even equal delays affect them more than they do AT & T because customers who switched to new carriers following conversion would believe that these carriers are responsible for the delay. In the view of the Court, this argument has a negligible factual basis, for it is as likely that customers who remain with AT & T will conclude that that company's service is declining and exercise their option to change carriers. More importantly, the requirement of equal access means only access that is "equal in type, quality, and price to that provided to AT & T...." Section II-A of the decree. That is being provided by the adjunct devices.[14]

### B. *Specific Complaints Regarding Compliance*

As concerns the specific Regional Companies about which interexchange carrier complaints have been noted, the Court concludes that most, but not all, of the Regional Companies are in compliance.

■ 1. Both Southwestern Bell and PacTel accelerated their conversion schedules to provide equal access within the two-year period following MCI's requests. These companies accomplished the conversions using a combination of switch replacements [15] and alternative technologies. Specifically, PacTel used System Contac, an alternative technology, to convert forty-four offices; [16] most of Southwestern Bell's conversions were accomplished using switch replacement, but with respect to twelve offices that company used EAS

20/20, another alternative technology. The Court concludes that these companies have provided equal access with minimum divergence as required by Appendix B.

■ 2. MCI requested that U S West convert 267 offices. In scheduling its conversions, U S West made liberal use of alternative technologies. It scheduled the conversions of 232 of the offices before the end of March 1988; some twenty-six other offices were scheduled to be converted by the end of 1988; and the nine remaining offices were to be converted between 1989 and 1991. As to these nine remaining offices, six were scheduled to be converted in 1989, two in 1990, and one in 1991.

U S West has not demonstrated any reason why conversion of any of these offices should take until this year, let alone 1991. Admittedly, these nine offices serve only 14,140 lines, but on the other hand, U S West has already had over three years in which to convert these offices. In order that the process may be completed, it is the Court's order that U S West shall by June 30, 1990 file a status report as to the conversion of these nine offices, and absent a cogent explanation for the delay, the conversion of all the offices scheduled for conversion shall be completed by September 30, 1990.

■ 3. MCI requested that NYNEX convert some 449 end offices to equal access, and NYNEX initially responded that it did not plan to complete conversion of these offices until 1992, relying upon the large number of conversions requested to justify its extended conversion schedule.

---

**14.** This does not mean that the Court has no concern about lengthy post-dial delays. The belief of all parties as well as of the Court at the time the decree was adopted was that equal access would not result in lower quality of service even in relatively remote areas. *See United States v. American Tel. and Tel. Co.*, 552 F.Supp. 131, 169 (D.D.C.1982); Department of Justice Final Report at 26. However, the question is whether concerns regarding the quality of access are properly dealt with by this Court under the guise of equal access proceedings, and the Court concludes that it is not. In any event, overall the quality of service appears to have increased, not declined.

**15.** Switch replacement may be preferable to the Regional Companies for reasons other than

mere age and depreciation. Many of the new options offered by the Regional Companies, such as call forwarding, can only be provided over new switches. Such innovations are likely to be more numerous and more profitable every year. On this basis, it is in the economic interest of the Regional Companies themselves to replace the antiquated switches.

**16.** PacTel had originally planned to convert five other offices served by step-by-step switches using the alternative technology. Instead it proposed a delay of three to four months to enable it to replace the switches. MCI agreed to this proposal.

This did not explain, however, why NYNEX was unable to convert even the same number of offices as the other Regional Companies prior to March of 1988. Based upon this consideration, and its evaluation of NYNEX's other justifications for delay, the Department of Justice has urged the Court to find that NYNEX is not in compliance with the equal access provisions of the decree. Final Report, January 29, 1988, at 70–71. The Court agrees with the Department's assessment.

NYNEX decided to accomplish conversion to equal access through switch replacement. It then set out a seven-year schedule for replacing the switches. While both MCI and the Department recognize that not all 449 offices could have been converted by the end of 1988, the Department points out that BellSouth replaced twice as many switches and replaced one million more lines than NYNEX by the end of 1988. Final Report at 76. In addition, the NYNEX filings prior to the issuance of the Department of Justice's Report of January 1988, completely failed to justify a schedule which extended the conversion dates well in 1992. With respect to many offices which were scheduled for conversion after March 1, 1988, NYNEX did not meet its burden under Appendix B of showing that the costs of conversion exceed the benefits.

However, following the filing of the Department's report, NYNEX has provided additional information as to the cost and difficulty of conversion in certain non-conforming offices, and it has made a commitment to convert these offices on an accelerated basis, in part by the use of alternative technologies. As for many of the offices which were to be converted beyond March 1, 1988, NYNEX committed to convert 126 MCI-requested 5xB offices by the end of 1988, to convert the JFK airport 5xB office by April 1989, and to replace the thirteen MCI-requested 1xB offices in 1990. NYNEX Supplemental Reply Comments,

April 28, 1988.[17] According to a January 29, 1989 status report, NYNEX has completed the conversion of the 126 5xB offices, relying primarily upon the use of adjuncts. However, the Court has not been advised whether the remaining targets have been met. NYNEX shall file a new status report within thirty days hereof. If the conversions have not been completed by that time, the Court will impose appropriate sanctions.

## V

### Pay Telephones

Pay telephones present different problems with respect to the objective of equal access. Once end offices serving home and business phones were converted to equal access, each home or business owner could presubscribe to the interexchange carrier of his choice, and the Regional Companies could program their systems to transmit the interexchange calls from that telephone to the proper carrier.

Conversion to equal access was not so simple with respect to pay telephones. First, such telephones are used by numerous individuals every day, many of whom might wish to use different long distance carriers. For that reason, the software required to transmit all calls to the proper interexchange carrier is complex. In addition, when the decree was initially approved, few interexchange carriers had the ability to perform many of the functions required for the use of pay telephones. Billing, in particular, presented serious obstacles to the ability of interexchange carriers other than AT & T to service pay telephones. As a result, all 0+ long distance calls[18] from pay telephones were routed to AT & T during the years immediately following divestiture.

On October 14, 1988, the Court ordered the Regional Companies to provide validation data necessary to enable interexchange carriers to bill customers for calls

---

**17.** The Court finds that in light of the accelerated schedule for these offices, the schedules with respect to the twenty-three 1xB offices scheduled for conversion in 1989, as well as the schedule for the step-by-step offices and the eight 3ESS offices are justified.

**18.** 0+ long distance calls are operator-assisted calls.

made using Regional Company calling cards. At the same time, it also ordered the companies to begin presubscription of public telephones to allow the interexchange carriers to compete for the business from specific pay telephones. Premises owners were to select the carrier to serve the telephones on their premises. *United States v. Western Electric Co.*, 698 F.Supp. 348, 368–369 (D.D.C.1988).

The Court recognized and noted at the time that this was an interim solution, and that there were still several unresolved issues preventing real equal access to pay telephones. First, while Regional Companies accepted AT & T calling cards for intra-LATA calls made over pay telephones, they did not accept the calling cards of other interexchange carriers. Second, 1+ sent-paid long distance traffic [19] would still be routed to AT & T following the October 14 Order. *See* 698 F.Supp. 348, 359–60, 367–69. The Court ordered the Regional Companies to file plans for resolving or alleviating these problems; such plans were submitted on December 30, 1988; numerous responses and comments were received, and the issues are now ripe for adjudication.[20]

### A. *Validation*

In order to accept calling cards, Regional Companies must be able to validate the cards by checking certain customer information. At the time of divestiture, the mechanism for conducting this validation was divided between AT & T and the Regional Companies. In the division of assets, the Regional Companies were assigned Data Base Administration Centers and Systems, and AT & T the Billing Validation Application database (BVA)—the actual database to which inquiries regarding customers must be made. As a result of this division, AT & T and the Regional Companies entered into the Shared Network Facilities Agreement to ensure their access to the information each of them needed. As part of this process, calling cards were issued to customers that bear the identical 14 digit number—the customer's phone number plus a four digit personal identification number (PIN). Because these numbers are identical for both sets of companies, Regional Companies are able to accept and validate AT & T calling cards using the BVA database. *See generally,* March 13, 1989 Department of Justice Memorandum at 7–11.

That is not true, however, with respect to the calling cards of other interexchange carriers, and many of them do not even have fourteen digit numbers on their calling cards. Others use the same system of the phone number plus a PIN, but the PIN differs from that issued by the Regional Company. For these reasons, validation of these cards by the Regional Companies is impossible using the technology and software now available.

Interexchange carriers confronted an additional problem in access to validation information because the Shared Network Facilities Agreement prohibits the Regional Companies from using the BVA to validate calling cards for other interexchange carriers without AT & T's permission. Given AT & T's opposition to such use of the BVA, the Regional Companies have had to replicate calling card validation information in parallel databases, in order to provide validation services to other carriers.

In their filings, the Regional Companies have described their progress in developing the Line Information Data Base (LIDB) which will serve as a functional equivalent of the BVA/DBAS systems for validation of all carriers' cards. Once each of the Regional Companies loads its fourteen-digit calling card numbers into its own database, and these various databases are interconnected, the companies will be able to validate calling cards without querying the BVA. Once this occurs, the companies will be able to route validation queries for fourteen-digit numbers to interexchange carrier databases. According to the companies,

---

**19.** 1+ sent-paid calls are calls that are paid for by coins deposited in the telephone mechanism.

**20.** Both the Department of Justice and the Regional Companies were very responsive in terms of proposing reasonable and practical solutions to the problems outlined above.

the Line Information Data Bases are expected to be interconnected in late 1990 and to replace the BVA/DBAS system when the Shared Network Facilities Agreement expires in December of 1991.

The Regional Companies have also addressed the possibility of establishing a uniform billing code system for all carriers. According to one option which has been adopted by the Consultative Committee for International Telephone and Telegraph (CCITT) and has gained the support of most of the parties, all of the codes would begin with the three figures 891 to identify the carriers as North American interexchange carriers, and the next three digits would indicate which specific carrier had issued the card. All of these codes would then be incorporated in the Regional Companies' databases, and these companies would thereafter be able to route the validation query to the card issuer. This is of course the optimal solution to the problem raised above, but the Regional Companies correctly note that it will not be operative for at least another year.[21]

■ The Regional Companies have proposed two solutions for the interim period. First, the companies will make available their codes to any interexchange carrier which requests acceptance of its calling cards for intra-LATA calls over public Regional Company-owned telephones. These carriers may then issue new cards to their customers bearing codes identical to those issued to those customers by the Regional Companies. Once that has been done, the carriers will be on the same footing as AT & T, and the Regional Companies will bill for calls made using their cards just as they do for calls made using the AT & T calling cards.

Several interexchange carriers object to this interim solution, most likely because it

will require them to issue new cards and to give the Regional Companies access to their calling card numbers and other data. Nevertheless, a requirement that the Regional Companies share card numbers is a step towards equal access which is capable of prompt implementation; it is desirable on that basis alone; and the Court hereby approves it.[22]

■ Second. In addition to providing shared card numbers to interexchange carriers, the Regional Companies have set forth a second interim plan through which they would accept fourteen-digit interexchange carrier cards with six-digit card-issuer identification codes (CIID) for proprietary calling cards.[23] This plan was intended to help address the advantage AT & T has in being the only carrier to issue and the Regional Companies to validate proprietary fourteen-digit cards for intra-LATA use. While the Department of Justice believes this plan to be consistent with the decree and the Court's October 14, 1988 Opinion, it has expressed concern that certain discriminatory practices would remain unless (1) AT & T converted all of its proprietary cards to the CIID format, or (2) the other interexchange carriers were issued three-digit Regional Accounting Office (RAO) codes by Bellcore for proprietary calling cards on the same basis as AT & T. *See* Department of Justice February 8, 1990 Memorandum on Calling Card Validation. According to the Department, the Regional Companies did not provide any justification for continuing to accept AT & T's proprietary fourteen-digit RAO cards for intra-LATA calling, when such RAO codes were not provided to those interexchange carriers that had requested them. The Department consequently proposed that the Court give AT & T a reasonable amount of time within which to convert to the CIID format, after which the Regional

---

21. Given that there is no 891 area code, this format will not conflict with any fourteen-digit LIDB format cards. *Consequently, it appears* that the LIDB system can co-exist with the new 891 system. *See* December 30, 1988 Ameritech Memorandum at 7.

22. At the same time, the acceptance of these cards will cause expense to the Regional Compa-

nies. Consequently, the Court will not require the companies to place this system into operation until an interexchange carrier has requested it.

23. A proprietary card number is one that is not shared with a Regional Company and that can be maintained in a database that is not controlled by a Regional Company.

Companies would stop validating AT & T RAO cards or Bellcore would have to begin assigning RAO codes to the interexchange carriers which requested them.

On May 1, 1990, the Regional Companies proposed certain changes in their CIID plan and noted certain changes in AT & T's policy with respect to their AT & T-only cards.[24] As for the CIID plan, they state that they will validate CIID codes which begin with the digits 3, 5, and 6, which are the digits with which the RAO codes begin. Further, all carriers will be able to choose the codes they want, thereby maintaining any "vanity" codes with which their customers are familiar. Given that these changes will make the CIID plan more attractive to interexchange carriers and will therefore make this an option which is more likely to be used, the Court endorses these changes. However, it is not obvious how the changes will alter the difference in treatment resulting from the fact that AT & T receives RAO codes for some of its proprietary cards, and other interexchange carriers do not. Consequently, the Court will approve these changes at this point, but will consider motions requesting the relief proposed by the Department of Justice.

As indicated, these solutions, too, are only interim solutions, and the Court expects the Regional Companies to develop and implement a universal and uniform billing code system for all carriers as rapidly as possible, and in a manner that will not discriminate among interexchange carriers. In order to discourage unnecessary delay, the Regional Companies shall by September 30, 1990 file updated comments regarding the progress of the development of and interconnection of the Line Information Data Base system and of a uniform billing code system.

### B. *Pricing*

■ The Regional Companies have filed certifications regarding their compliance with the Court's requirement that they not discriminate in the prices charged to AT & T and those charged to the other interexchange carriers with respect to validation. *See* 698 F.Supp. at 368, 355, notes 35 and 36. Some interexchange carriers contend that the companies have failed to provide enough information to permit the Court to evaluate whether the prices charged are non-discriminatory, and they have requested that the Court request an investigation by the Federal Communications Commission or the Department of Justice into the pricing methodology. *See* MCI Memorandum of January 23, 1989 at 10–12; ITI January 23, 1989 Memorandum at 7. Some carriers also argue that, based on the information the Regional Companies have provided, it is apparent that they are discriminating by charging the smaller interexchange carriers for services only AT & T receives or by charging them a lump sum price which results in a higher charge per validation query than what AT & T is being charged.[25] However, the Regional Companies have provided explanations for their charges, and given that the Court has indicated that it does not intend to become involved in the pricing of Regional Company services unless discrimination with respect thereto is plain, the Court has concluded that explanations provided by the companies are sufficient.

■ What is apparent, however, is that some Regional Companies have significantly lower validation prices than others.[26]

---

**24.** The Regional Companies note that AT & T has agreed to have the companies place AT & T-only numbers into their Line Information Data Bases and other validation databases for access by other interexchange carriers, thereby retracting the position it took the year before. *See* March 13, 1989 Reply of AT & T at 7–9. This agreement will resolve the problems non-AT & T service providers encountered in trying to validate these cards, and the Court thus welcomes it as another step towards equal access. Supplemental Memorandum of the Bell Operating Companies on Calling Card Acceptance, May 1, 1990 at 7.

**25.** *See* MCI January 23, 1989 Memorandum at 12; US Sprint January 23, 1989 Memorandum at 15–20; ITI January 23, 1989 Memorandum at 3–14.

**26.** According to US Sprint, the Regional Company prices for validation of data vary by over 400%. US Sprint Memorandum at 15. According to ITI, Bell Atlantic has priced its validation

According to the Department of Justice, this variance suggests that the several Regional Companies have used different methods for arriving at the price an interexchange carrier is charged. In particular, it appears that some of this variance may be attributed to the fact that in setting the "same price" to be charged to the interexchange carriers and AT & T, some Regional Companies have in effect charged interexchange carriers for the costs of services that only AT & T receives. Department of Justice March 13, 1989 Memorandum at 30–31. The Department of Justice recommends, and the Court agrees, that in setting the price for interexchange carriers who want only validation data services, the Regional Companies may not include the costs attributable to services only AT & T receives as part of a bundle of services. Accordingly, any Regional Company which has included such costs in the prices it charges to the other interexchange carriers is hereby required to make the necessary price modifications. *Id.* at 31.[27] The Department of Justice is requested to monitor compliance.

### C. *1+ Sent–Paid Traffic*

■ On February 6, 1984, the Court granted a waiver allowing the Regional Companies to continue routing of all 1+ sent-paid traffic from pay telephones to AT & T. *United States v. Western Electric Co.,* slip op. February 6, 1984; *see also,* 698 F.Supp. at 367–68. This waiver was to last until the Regional Companies could overcome the technical obstacles to equal access from these telephones. The Regional Companies have proposed various means for ending this automatic routing to AT & T. An initial difficulty with all such plans is that very few of the interexchange carriers are capable of handling such traffic at this time. Thus, a strict requirement of access in this area would be likely to harm

consumers who are unable to complete calls. On the other hand, all of the Regional Companies concede that this situation is changing, and all of them have advanced proposals which indicate that equal access is possible within the near future.

One short-term option suggested by nearly all the parties is the routing of all sent-paid traffic to the interexchange carrier serving the pay telephone through the use of direct trunking. These direct trunks would run from end offices to the interexchange carrier's points of presence. While everyone agrees that direct trunking can be implemented almost immediately, it has several drawbacks. First, it may be extremely costly to implement and therefore may be a worthwhile investment in only a few areas in which sent-paid traffic is likely to be particularly heavy. *See* Bell Atlantic December 30, 1988 Response at 16–17; US Sprint January 23, 1989 Response at 10. A second problem with direct trunking arrangements is that not all interexchange carriers are currently able to handle sent-paid traffic.

Nevertheless, the Department of Justice, several Regional Companies, and many interexchange carriers assert that direct trunking arrangements can be provided by the Regional Companies at the request of any interexchange carrier which is able to handle sent-paid traffic. *See* Department of Justice Memorandum at 26; US Sprint January 23, 1989 Memorandum at 10; MCI January 23, 1989 Memorandum at 5–6; Bell Atlantic December 30, 1988 Memorandum at 16; BellSouth December 30, 1988 Memorandum at 13–16; NYNEX December 30, 1988 Memorandum, Attachment C, p. 3. The Court agrees that this is an appropriate interim measure, and it requires its adoption. Consequently, the Regional Companies will be expected to honor any bona fide requests for direct trunking by

---

data so high that no IXC has purchased the data. ITI January 23, 1989 Memorandum at 8.

**27.** An additional complaint of the interexchange carriers is that, in charging a fixed price for access to the validation database although AT & T makes far more use of the database than the other interexchange carriers, the Regional Com-

panies are discriminating against the smaller interexchange carriers who in effect pay more per validation query than AT & T. *See, e.g.,* MCI Memorandum at 12; US Sprint Memorandum at 2–24. However, as the Court has previously indicated, it will not become involved in establishing specified price structures.

an interexchange carrier within a reasonable time period. Absent unusual circumstances, the Court will consider six months to be the maximum amount of time necessary to provide such access. If a Regional Company determines that it is not feasible to provide such service at all or within six months of a request, it must promptly justify this determination based upon the cost, technical feasibility and time required for implementation, and discuss any possible alternatives.

 There is also widespread agreement that the ultimate solution to the issue of sent-paid traffic lies in a combination of switch modification and software development to permit routing of sent-paid calls to all interexchange carriers through tandem connections. As the Court noted in its October 14, 1988 Opinion, a version of such software for its switches had been developed by Northern Telecom. *See* 698 F.Supp. at 367.[28] However, in order to implement this system, the software must be in place in both the end offices and tandem switches, and at this point, AT & T Technologies has not developed such software to be used over its own switches. In view of Northern Telecom's success in this area, there is no reason why AT & T should be incapable of developing the appropriate software; the question is only how quickly this software can be produced and become operational.

Several of the Regional Companies suggest that this can be done relatively quickly, while others request an indefinite continuation of the waiver granted in 1984. The Court agrees with the Department of Justice that there is no reason for extending the waiver indefinitely. *See* Department of Justice March 13, 1989 Memorandum at 24. The necessary software is being developed, and there is no reason or excuse for a prolongation of this barrier to equal access. Accordingly, the Court now orders that the existing waiver shall expire twelve months from the date of this Opinion. This will allow time for the complete development of the software, installation, and any necessary modifications to the Regional Company equipment.

The Court expects the Regional Companies to request that AT & T move expeditiously to provide the necessary technology to implement tandem access for sent-paid calls. The Court will not specify the means by which the end of routing to AT & T must be accomplished because it is possible that new and better software than that which currently exists might be developed. Instead, it will require the Regional Companies simply to submit to the Department of Justice their plans for rerouting sent-paid traffic within six months from the date of this Opinion. Further, as recommended by the Department of Justice, the Court will also require the Regional Companies to maintain records of any requests for sent-paid access and their disposition, as well as any orders placed with switch vendors for the necessary software and their status. The Department shall thereafter advise the Court of its view regarding compliance, in particular with respect to any disputed technical aspects.

The Court recognizes, of course, that the Regional Companies are in a peculiar sense at the mercy of AT & T as to their compliance. Accordingly, if problems arise with regard to AT & T's progress towards developing the technology, despite the best efforts of the Regional Companies, they should so inform the Department of Justice on the date specified above. At that time the Department may, for good cause shown, request a limited extension of the waiver. However, given AT & T's stated commitment to develop and support the new technologies upon request of the Regional Companies, *see* AT & T March 13, 1989 Reply at 10–11, the Court does not anticipate that this will be necessary.

VI

*Preliminary Accounting for EANR Cost Recovery*

 AT & T is under an obligation to reimburse the Regional Companies for the

---

**28.** Currently, Northern Telecom has developed new software which will permit tandem routing for its DMS–100 and TOPS switches.

costs of Equal Access and Network Reconfiguration (EANR) which have not been recovered by January 1, 1984 through their collection of carrier access tariffs. 569 F.Supp. 1057, 1068 (D.D.C.1983). The Regional Companies, in turn, must maintain records to isolate the expenses incurred strictly for equal access and network configuration, to submit preliminary accountings of their equal access and network reconfiguration costs on or by January 1, 1989, and to report to the Court on or before January 1, 1994 whether or not all costs have been recovered. *Id.* at 1068 and n. 37. As required, each of the Regional Companies submitted a preliminary accounting in the last week of December 1988.[29] These accountings indicate that most of the companies have fully recovered their costs for this period through carrier access tariffs. However, a few have not.[30]

In response to these submissions, AT & T claims that the accountings are not sufficiently detailed, and it has requested the Court not to accept them. AT & T January 27, 1989 Motion at 2–9. AT & T also argues that the size of the shortfalls and the expense of performing a detailed and accurate accounting do not warrant an accounting at this stage, and it has requested that the Court defer the preliminary accounting until January 31, 1992. *Id.* at 9–11. The company has proposed that a thorough and accurate accounting be done at that point, so that any unrecovered shortfalls can be included in the tariffs for the final year. *Id.* at 10–11.

In fact, both AT & T and the Regional Companies now agree that a detailed accounting at the present time would be pre-mature and unnecessarily costly, and the Court likewise agrees. The purpose of having the Regional Companies file preliminary accountings in 1989 was to gain some sense of whether or not the tariff recovery program for equal access construction is working. The preliminary accountings indicate that it is. A detailed accounting at this stage, when no claims for reimbursement can be made, would not be warranted, for it would have to be repeated in 1994 if a Regional Company were to make a claim at the end of the ten-year guarantee period.

 For the same reason, an accounting in 1992, as requested by AT & T, would be premature. Although the Regional Companies could report to the Court before January 1, 1994, that all costs have been recovered, they are under no obligation to do so or to discharge AT & T of its reimbursement obligation prior to 1994. In addition, unless a Regional Company makes a claim for reimbursement at the end of the ten-year guarantee period, it would not need to give a detailed accounting or to demonstrate its compliance with the requirements of the recovery program outlined in the proviso to the guarantee. *See* 569 F.Supp. at 1128. Accordingly, the Court will accept the preliminary accountings of the Regional Companies as filed, and it will not alter the equal access accounting schedule that was established in 1983.

 The Court also finds that resolution of any dispute between AT & T and some of the Regional Companies as to the nature of the provisos and the accounting process would be premature at this stage.[31]

29. The accounting period for BellSouth and Bell Atlantic covers the period between January 1, 1984 and June 30, 1988; the accounting period used by U S West and NYNEX extends up to September 30, 1988; and that for Ameritech, Southwestern Bell, and Pacific Telesis extends to December 31, 1988.

30. The accounting by Pacific Telesis indicates a total net cost of $5.4 million, $3.4 million of which is allegedly eligible for the equal access cost recovery guarantee. The accounting for Southwestern Bell indicates a shortfall of $14.4 million. Bell Atlantic claims to have a shortfall of $260,000, but has indicated that it has been ordered by the FCC to refund $6 million of its revenues. *See* Preliminary Accountings filed December 28 and December 30, 1988.

31. According to two of the provisos to the guarantee, AT & T's obligation shall be discharged to the extent that: (a) the Regional Company fails annually to file carrier access tariffs designed to recoup any then-unrecovered equal access and network reconfiguration costs by January 1, 1994; or (b) any regulatory commission refuses to permit such tariffs to take effect. 569 F.Supp. 1128. AT & T contends that its obligation as to any then-unrecovered shortfalls for a particular year is discharged if the shortfall is

The arguments on these issues have not been addressed by all potentially interested parties, and they may in any event be moot if the Regional Companies have no reimbursement claims to make in 1994. The appropriate time to resolve any disputes as to EANR costs is if and when any claims are made, and as the Court has previously indicated, it will do so at that time, with the assistance of the Department of Justice and the Federal Communications Commission if necessary. *See* 569 F.Supp. at 1068 and 1126 (n.13).

not actually included in subsequent tariffs, regardless of the reason such costs are not rolled over. AT & T Reply at 2. According to NYNEX, because regulators have not permitted the Regional Companies to include prior EANR costs in subsequent tariff rates on the ground that this would violate rules against retroactive ratemaking, imposing this rollover requirement would effectively discharge AT & T's obligation for all but the final year of the guarantee period. NYNEX March 9, 1990 Supplemental Response at 3 and n. 4. Both Southwestern Bell and NYNEX contend the purpose of the proviso was to protect AT & T from the possibility that the Regional Companies and the regulators would collude to underprice access services at AT & T's expense, while at the same time making AT & T the ultimate guarantor of unrecovered costs attributable to market forces or bypass by AT & T. According to these filings, it follows from this understanding of the proviso that when a tariff is established in a good faith attempt to recover costs for that year and in compliance with the rules regarding retroactive ratemaking, the Regional Companies have met their obligation under the proviso, notwithstanding the fact that the unrecovered costs were not passed on in future tariff rates. Although it is unclear what would be the ramifications of such an interpretation, it appears that it would result in holding AT & T accountable on a year-to-year basis. However, for the reasons indicated above, the Court need not and therefore will not resolve the issue at this time.